UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    Docket No.: 3:22-cv-83

MURPHY MEDICAL ASSOCIATES, LLC;    :
DIAGNOSTIC AND MEDICAL SPECIALISTS    :    **COMPLAINT**
OF GREENWICH, LLC; and STEVEN A.R.    :
MURPHY, M.D.,    :    **JURY TRIAL DEMANDED**
                                              :
                              Plaintiffs,    :
        vs.    :
                                              :
UNITED MEDICAL RESOURCES, INC.    :
                                              :
                              Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


Plaintiffs Murphy Medical Associates LLC, Diagnostic and Medical Specialists of Greenwich, LLC (collectively, "Murphy Practice") and Steven A.R. Murphy, M.D. ("Dr. Murphy"), by their attorneys, Harris Beach, PLLC, for their Complaint against the Defendant, United Medical Resources, Inc. ( "UMR" or "Defendant"), allege as follows.

## INTRODUCTION

1.    Plaintiffs bring this case because UMR, one of the largest third-party administrators of self-funded provider plans in the United States, is blatantly defying federal and state law, as well as principles of equity, by refusing to reimburse Plaintiffs for COVID-19 testing that Plaintiffs provided to members and/or beneficiaries of the self-funded health plans that UMR administers.

2.    In 2020, and in response to the COVID-19 pandemic and public health emergency, Congress twice passed statutes – the Families First Coronavirus Response Act (FFCRA) and the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) – requiring all fully-insured, level-funded, and self-insured health plans, including those plans that UMR administers, to cover such COVID-19 tests and related services, regardless of whether they are provided by in-network

or out-of-network providers. Such coverage must be complete: copayments, deductibles, coinsurance and limits on coverage are not permitted.

3.      The recent emergence of the highly transmissible Omicron variant ensures that the need for continued, efficient COVID-19 testing persists. The Murphy Practice will continue to provide critical COVID-19 testing to uphold its Hippocratic Oath during this public health crisis.

4.      UMR, however, has refused to honor federal law and, instead, has issued outright denials or infinitesimal "reimbursement" of claims submitted by the Murphy Practice. The Murphy Practice has appealed every claim submitted to UMR, which were summarily denied and later advised to the Murphy Practice that it has exhausted all appeal rights.

5.      Plaintiffs, therefore, are left with no recourse against UMR other than through this Court to hold UMR accountable for its wrongful conduct during the current public health crisis.

## PARTIES

6.      At all times relevant to this matter, Plaintiff Murphy Medical Associates LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 30 Buxton Farms Road, Stamford, Connecticut 06905.

7.      At all times relevant to this matter, Plaintiff Diagnostic and Medical Specialists of Greenwich, LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 30 Buxton Farms Road, Stamford, Connecticut 06905.

8.      At all times relevant to this matter, Plaintiff Steven A.R. Murphy, M.D. ("Dr. Murphy") is a physician licensed to practice medicine in Connecticut and New York. His principal place of practice is located at 30 Buxton Farms Road, Stamford, Connecticut 06905.

9.      Dr. Murphy, a board-certified internist, is the principal of the Murphy Practice.

10.     Dr. Murphy completed his internship in medical genetics and pediatrics at Mount Sinai Hospital in New York. He subsequently served as the Chief Resident for Internal Medicine

at Greenwich Hospital-Yale New Haven Health in Greenwich, Connecticut from July 2007 through May 2008. Prior to entering private practice, Dr. Murphy also served as a clinical fellow in medical genetics at Yale Medical School in New Haven, Connecticut from June 2008 until November 2008.

11.     As a physician, Dr. Murphy specializes in general medical care, personalized medicine and genetics, weight loss medicine, adolescent care, and hereditary cancers. In addition, Dr. Murphy is an FAA Senior Aviation Medical Examiner, a United States Civil Surgeon, and an obesity medicine specialist.

12.     Dr. Murphy also serves as an assistant professor of medicine, cell biology, and anatomy at New York Medical College in Valhalla, New York.

13.     Dr. Murphy is the certified laboratory director for Plaintiff Diagnostic and Medical Specialists of Greenwich, LLC under the federal Clinical Laboratory Improvement Amendments ("CLIA") and Connecticut law.

14.     Upon information and belief, Defendant UMR is one of the largest third-party administrators of self-funded health plans with its principal place of business located at 115 W Wausau Avenue, Wausau, Wisconsin 54401. UMR is a fully owned subsidiary of United Healthcare Services, Inc. ("United").

15.     Upon information and belief, UMR is an administrator of various health plans that it administers as a self-funded payer ("SFP") because it pays the costs of health care services provided by healthcare providers to members and/or beneficiaries of those plans out of its own funds.

16.     As a SFP administrator, UMR acts in a role similar to commercial health insurers by reimbursing providers for services provided to patients covered by health plan(s) that UMR

administers.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this dispute under 28 U.S.C. § 1331 because the Murphy Practice asserts federal claims against UMR under the Families First Coronavirus Relief Act, the CARES Act, the Affordable Care Act, and ERISA.

18.     This Court also has supplemental jurisdiction over the Murphy Practice state law claims against UMR because these claims are so related to the Murphy Practice's federal claims that the state law claims form a part of the same case or controversy. This Court accordingly has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

19.     This Court also has personal jurisdiction over UMR because carries on one or more businesses or business ventures in this judicial district; there is the requisite nexus between the businesses and this action; and UMR engages in substantial, and not isolated, activity within this judicial district.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial portion of the events giving rise to this action arose in this District.

## FEDERAL LAW REQUIRES UMR TO REIMBURSE PLAINTIFFS

21.      In March 2020, Congress, in recognition of the COVID-19 public health emergency and the desperate need to address it by making COVID-19 testing readily available to anyone who needed or wanted it, enacted two statutes that addressed the issue of payment for testing: the Families First Coronavirus Response Act ("FFCRA") and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

22.     Specifically, through the FFCRA, Congress mandated that health plans, including SFPs and SFP administrators, such as UMR's, must cover and reimburse providers for conducting COVID-19 testing, COVID antibody testing, and related testing and services.

23.     In recognition of the public health crisis, Congress went much further than merely requiring health plans to cover testing.  To ensure that no patient would be deterred from getting a COVID-19 test due to a concern for the cost, Congress required coverage for COVID-19 testing and related services to be provided without cost sharing, deductibles, copayments or coinsurance, or other medical management requirements, regardless of whether the COVID-19 testing and related services were provided by "in-network" or "out of network" providers.

24.     Indeed, guidance from the Departments of Labor, Health and Human Services and the Treasury has clarified that the FFCRA and the CARES Act apply to COVID-19 testing, antibody testing, and related services rendered by both "in-network" and "out-of-network providers." [1]

25.     In essence, Congress sought to ensure that any patient with health coverage could get a COVID-19 test without any out-of-pocket costs, and without having to get permission from their health plan or employer or administrator under a SFP, like UMR.

**PLAINTIFFS' RESPONSE TO THE COVID-19 CRISIS**

26.     Formed by Dr. Murphy over a decade ago, the mission of the Murphy Practice is to provide high-quality preventive and general health services, as well as acute primary care, to men, women, and adolescents. Dr. Murphy, a board-certified internist, is the principal of the Murphy

---

[1] FAQs dated April 11, 2020, at Q.7 and Q.4, available at https://www.cms.gov/files/document/FFCRA-Part-42-FAQs.pdf

Practice.

27.    Among its other services, the Murphy Practice operates a state-licensed physician office laboratory located at 30 Buxton Farms Road in Stamford, Connecticut. Dr. Murphy is the certified laboratory director for this laboratory under the federal Clinical Laboratory Improvement Amendments ("CLIA") and Connecticut law.

28.    On or about March 9, 2020 and in response to the COVID-19 pandemic, the Murphy Practice, an internal medicine practice with offices throughout Connecticut, invested hundreds of thousands of dollars to transform its traditional medical practice to set up COVID-19 testing sites throughout Connecticut and New York.

29.    These sites were erected virtually overnight and were designed to provide efficient drive and/or walk-through COVID-19 testing to patients with symptoms or suspected exposure to the novel coronavirus. These sites helped to fill the void for COVID-19 testing and were unquestionably one of the first lines of defense against the pandemic.

30.    In addition to creating the physical infrastructure for the sites, the Murphy Practice had to assemble the clinical and administrative staff needed to operate the sites and to perform the testing, including physicians, medical students, physician assistants, nurse practitioners, registered nurses, medical assistants, registrars, coordinators, and IT staff. It also had to develop extensive protocols and procedures to ensure the sites were effectively and efficiently operating, and all safety, infection control, OSHA, and CDC guidance were observed.

31.    Ultimately, the Murphy Practice operated drive and/or walk-through COVID-19 testing sites in, among other places, Greenwich, Stamford, New Canaan, Darien, Fairfield, Bridgeport, New Haven, West Haven, Stratford, and Ridgefield, Connecticut, and Bedford, Brooklyn, and Pound Ridge, New York.

32.     Since March 9, 2020, the Murphy Practice has provided COVID-19 testing and/or related services to over 35,000 patients and engaged in over 85,000 unique encounters with those patients.

33.     Generally, the Murphy Practice has utilized nasopharyngeal swabs to collect patient samples to test for SARS-CoV-2, which was either sent to the Murphy Practice's lab or to a third-party laboratory for processing.

34.     Through its fully licensed physician office laboratory located at 30 Buxton Farms Road in Stamford, Connecticut, the Murphy Practice has been able to process internally many of the patient samples that the Murphy Practice collects.

35.     Each swab taken by the Murphy Practice was either sent to the Murphy Practice's lab or to a third-party laboratory for processing.

36.     In May 2020 an advanced BioFire Film Array System, with COVID-19 testing capability, was approved by the FDA for COVID-19 testing.[2] The Murphy Practice was able to purchase the new BioFire machine.

37.     According to the makers of BioFire, "[t]he inclusion of SARS-CoV-2 in the BIOFIRE® RP2.1 panel allows healthcare providers to quickly identify patients with common respiratory pathogens, as well as those with COVID-19, using one simple test. The BIOFIRE® RP2.1 panel takes approximately 45 minutes and tests nasopharyngeal swab samples in transport media."[3]

38.     Beginning in or about June 1, 2020, and for the vast majority of swabs that the Murphy Practice processed internally in its laboratory, the Murphy Practice utilized the BioFire

---

[2] https://docs.biofiredx.com/wp-content/uploads/PRESS-RELEASE-BIOFIRE%C2%AE-Respiratory-Panel-2.1-RP2.1-with-SARS-CoV-2.pdf
[3] Id.

2.1 Respiratory Panel, a respiratory panel that tests for 22 respiratory pathogens, including SARS-CoV-2.[4]

39.    The BioFire 2.1 Respiratory Panel allows the Murphy Practice to test for COVID-19 as well as other respiratory viruses and infections that could possibly cause the same or similar symptoms as COVID-19, or could possibly co-exist with COVID-19. Information about other potential respiratory viruses or infections is vitally important to ensure that patients who present with symptoms or were possibly exposed to COVID-19 receive the most appropriate and effective course of treatment.

40.    In fact, medical studies have concluded that a significant percentage of patients (20% in one study) who tested positive for COVID-19 also tested positive for one or more respiratory pathogens.[5]

41.    FAQs regarding the federal COVID-19 testing law that have been prepared jointly by the Departments of Labor, Health and Human Services (HHS), and the Treasury (collectively, "FAQs"), state that "the CDC strongly encourages clinicians to test for other causes of respiratory illnesses."[6]

---

[4]  On March 17, 2021, the BioFire 2.1 became the ***first*** Covid-19 test to upgrade from an emergency use authorization to fully approved FDA status.  *See* https://www.biomerieux.com/en/biofirer-respiratory-21-rp21-panel-sars-cov-2-obtains-de-novo-fda-authorization; https://www.news-medical.net/news/20210317/FDA-authorizes-marketing-of-first-SARS-CoV-2-diagnostic-test-using-De-Novo-premarket-review-pathway.aspx.  The myriad benefits of testing for other pathogens simultaneously with testing for SARS-CoV-2 are well stated in the literature and federal guidance.

[5]  Of the 116 specimens positive for SARS-CoV-2, 24 (20.7%) were positive for 1 or more additional pathogens, compared with 294 of the 1101 specimens (26.7%) negative for SARS-CoV-2 (Table 1) (difference, 6.0% [95% CI, –2.3% to 14.3%]). "Rates of Co-infection Between SARS-CoV-2 and Other Respiratory Pathogens," JAMA. 2020;323(20):2085-2086.doi:10.1001/jama.2020.6266, Available at https://jamanetwork.com/journals/jama/fullarticle/2764787

[6]  See FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation (hereinafter "FAQs"), Part 42 (April 11, 2020), available at https://www.cms.gov/files/document/FFCRA-Part-42-FAQs.pdf at Q.5.

42.    The Murphy Practice's use of its BioFire machines at its internal laboratory allowed the Murphy Practice, generally, to analyze the samples being tested and produce results at a much faster rate than commercial third party labs.

43.    In addition to the testing, the Murphy Practice, when medically appropriate, also conducted a thorough medical history and basic examination on patients who seek COVID-19 testing. A baseline assessment of the patient's current medical status is absolutely required to ensure that the patient receives the most appropriate and effective treatment. Patients also need preventative medicine counseling regarding the taking of universal precautions and other vitally necessary actions or things to avoid. All of this was particularly important during the early days of the pandemic when patients had little personal direct access to primary care physicians because of pandemic closures.

44.    Further, during the time period between the day the sample was taken and the results were available, the Murphy Practice's clinical personnel conducted telemedicine visits with the patients to check on their conditions and determine whether further medical intervention was needed. The frequency and duration of these visits was dependent on each patient's unique condition, with an emphasis and priority on following up with patients suspected of being infected with the virus.

45.    Beginning in or about May 2020, the Murphy Practice began providing COVID-19 testing and related services to members of UMR's SFP health plans it administers.

46.    The Murphy Practice generally receives assignment of benefit forms from patients who receive testing services at the Murphy Practice testing sites. Other patients that registered electronically assigned their benefits to the Murphy Practice.

47.    Exhibit 1 to this Complaint is a complete list of the claims that are the subject of this Complaint.[7]

---

[7] In order to protect the patients' identity, the Murphy Practice will only reference each patient's identity by their initials throughout the spreadsheet.

48.     As the operator of state- or locality-administered sites, drive-through sites, and/or sites that do not require appointments, plans and issuers generally must assume that the receipt of the test reflects an "individualized clinical assessment."

49.     As a result, the Murphy Practice was entitled to assume the diagnostic impetus behind each test, consistent with the goals of both pieces of legislation: anyone who wanted a test could get a test.

50.     Upon information and belief, all swabs of UMR members and/or beneficiaries were processed in the Murphy Practice's laboratory.

51.     Based on the provisions of the FFCRA, the CARES Act, and the Affordable Care Act discussed above, the Murphy Practice had every expectation that UMR would honor its obligations and reimburse the practice for COVID-19 testing and related services provided to its members or beneficiaries. Indeed, other SFP's and/or SFP administrators similarly situated to UMR honored their obligations to the Murphy Practice.

52.     To date, the Murphy Practice has billed UMR approximately $845,789.01 for over 780 claims relating to COVID-19 testing and related services provided to the aforementioned UMR members and/or beneficiaries, yet has only been reimbursed approximately $62,780.44.

53.     As a result, UMR owes the Murphy Practice approximately $783,008.57 for COVID-19 testing and related services provided to the aforementioned members and/or beneficiaries of UMR's SFPs.

54.     In response to UMR's denials, the Murphy Practice, and through counsel, sent numerous correspondence to UMR requesting an explanation for UMR's behavior.

55.    UMR either ignored or failed to engage in a meaningful dialogue regarding the claims and, instead, continued to send denials or send fractional reimbursement checks to the Murphy Practice.

56.    The Murphy Practice has attempted to appeal every claim which UMR has denied and, through that appeal process, sent UMR hundreds of pages of responsive medical and laboratory records.

57.    The Murphy Practice's efforts have largely fallen on deaf ears.

58.    UMR, notwithstanding the aforementioned FFCRA and CARES Act, has summarily denied each attempted appeal without any investigation into the claims.

59.    Each denial was made without sufficient investigation, lacked any reasonably arguable basis and was in violation of federal and state law.

60.    UMR has since advised the Murphy Practice that the Murphy Practice has exhausted its right of appeal on any of the denied claims.

61.    UMR has unlawfully denied each claim submitted by the Murphy Practice in order to strangle and ultimately force the Murphy Practice to accept dramatically reduced reimbursement rates for COVID-19 testing and related services.

62.    UMR is well aware that the Murphy Practice's ability to continue to operate these necessary COVID-19 testing sites is severely hampered by withholding payment for COVID-19 testing and related services provided by the Murphy Practice to UMR members and/or beneficiaries.

63.    This is precisely UMR's intent.

64.    Despite not receiving any reimbursement from UMR, the Murphy Practice has not and will not bill a UMR member or beneficiary (or any patient for that matter) for any of the testing services during this public health crisis.

65.    Despite not receiving any reimbursement from UMR, the Murphy Practice will continue running all of its existing testing sites and will establish new testing sites to care for all patients, including UMR members and/or beneficiaries, to help curb the spread of the recent Omicron variant during this everlasting public health crisis.

**FIRST CAUSE OF ACTION**
**(FFCRA and CARES Act)**

66.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained above as if more fully set forth at length herein.

67.    As a SFP and/or SFP administrator, UMR pays the costs of healthcare services provided by healthcare providers to UMR's enrollees out of its own funds. It acts in a role similar to a commercial insurer in reimbursing healthcare providers directly for services they provided to persons covered by UMR's health plans or health plans UMR administers.

68.    As a result, UMR, a self-funded health plan and/or administrator of a self-funded health plan is a health insurance issuer offering individual and group health insurance coverage, as those terms are defined under section 6001 of the Families First Coronavirus Response Act.

69.    The COVID-19 testing and related services that the Murphy Practice provided to UMR members and beneficiaries constitute in vitro diagnostic products for the detection of COVID-19 or the diagnosis of the virus that causes COVID–19 that are approved, cleared, or authorized under Federal Food, Drug, and Cosmetic Act, and the administration of such in vitro diagnostic products pursuant to 21 C.F.R. § 809.3(a), as provided by section 6001 of the FFCRA.

70.    To the extent that any UMR members and/or beneficiaries submitted to the Murphy Practice for COVID-19 testing for non-diagnostic purposes (i.e. faculty return to work testing mandates or student return to school testing mandates), UMR was still financially responsible to

reimburse the Murphy Practice for the costs of each test, since the Murphy Practice was entitled to assume the diagnostic impetus behind each encounter. [8]

71.     The Murphy Practice did not have a negotiated rate with UMR for the provision of these services.

72.     Under section 3202(a) of the CARES Act, if a health plan, SFP or administrator of an SFP, such as UMR, does not have a negotiated rate with a provider such as the Murphy Practice for providing COVID-19 testing and/or related services, the health plan is obligated to pay the provider its cash price for providing those services.

73.     UMR, despite numerous and persistent demands and requests, has failed and refused to provide anything remotely close to the Murphy Practice's cash price for providing the COVID-19 testing related services.

74.     By reason of the foregoing, Plaintiffs have been damaged and are entitled to a judgment against UMR in the amount of at least $783,008.57, plus interest, together with the costs and disbursements of this action, including reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
### (ACA)

75.     Plaintiffs repeat, reiterate and reallege each and every allegation contained above as if more fully set forth at length herein.

76.     The Patient Protection and Affordable Care Act added section 2719A to the Public Health Services Act, 42 U.S.C. § 300gg-19a.

77.     Section 2719A requires any group health plan, or health insurer that provides or covers benefits with respect to services in an emergency department of a hospital, to cover any emergency services, including, emergency services outside of the emergency department, without

---

[8] FAQs Part 44 (February 26, 2021).

the need for prior authorization, without regard to the provider's status as an out-of-network provider, and in a manner that ensures that the patient's cost-sharing requirement is the same requirement that would apply if such services were provided in-network. 42 U.S.C. § 300gg-19a. These requirements are expressly incorporated into group health plans covered by ERISA. 29 U.S.C. § 1185d(a).

78.    UMR's health plans at issue in this lawsuit are health plans that are subject to the provisions of 42 U.S.C. § 300gg-19a or 29 U.S.C. § 1185d(a).

79.    The COVID-19-related testing services provided by the Murphy Practice that are at issue in this lawsuit meet the definition of emergency services under 42 U.S.C. § 300gg-19a.

80.    Accordingly, UMR was obligated to cover these COVID-19-related testing services under 42 U.S.C. § 300gg-19a and 29 U.S.C. § 1185d(a).

81.    Regulations provided pursuant to these sections require that, to satisfy their coverage obligations for emergency services, health plans must reimburse out-of-network providers at the greater of (a) the amount negotiated with in-network providers for the emergency service, accounting for in-network co-payment and co-insurance obligations; (b) the amount for the emergency service calculated suing the same method the plan generally uses to determine payments for out-of-network services (such as usual, customary, or reasonable charges), but substituting in-network cost-sharing provisions for out-of-network cost-sharing provisions; or (c) the amount that would be paid under Medicare for the emergency service, accounting for in-network co-payment and co-insurance obligations. 29 C.F.R. § 590.715-719A(b)(3)(i)(A)-(C).

82.    UMR, despite numerous and persistent demands and requests, has failed and refused to provide to the Murphy Practice anything remotely close to the reimbursement required by 29 C.F.R. § 590.715-719A(b)(3)(i)(A)-(C).

83.    By reason of the foregoing, Plaintiffs have been damaged and are entitled to a judgment against UMR in the amount of at least $783,008.57, plus interest, together with the costs and disbursements of this action, including reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
**(ERISA)**

84.    Plaintiffs repeat, reiterate and reallege each and every allegation contained above as if more fully set forth at length herein.

85.    Even if the FFCRA and CARES Act did not, on their own, obligate UMR to reimburse the Murphy Practice for the medically necessary COVID-19-related testing and related services that it performed – which they most certainly do – UMR would still be obligated to reimburse the Murphy Practice for these services. This is because the FFCRA and CARES Acts are to be treated, for enforcement purposes, as if they were included in ERISA.

86.    Even were this not the case, the FFCRA and the CARES Act broadly apply to all health care plans, including self-funded health plans governed by ERISA, meaning that ERISA plans are required to cover COVID-19 testing and related services as provided in the FFCRA and the CARES Act.

87.    On information and belief, a significant number of claims the Murphy Practice has submitted to UMR relate to patients enrolled in UMR's health plans or health plans UMR administers subject to ERISA. ERISA, the FFCRA, the CARES Act and Affordable Care Act all require UMR —as a SFP or SFP administrator— to cover COVID-19 testing and related services regardless of the terms of their plan.

88.    Upon information and belief, the UMR health plans do not prohibit patients from assigning their rights to benefits under the plans to the Murphy Practice, including direct payment of benefits under the plans to the Murphy Practice.

89. As such, the Murphy Practice has standing to pursue claims under ERISA as the assignee and authorized representative of its patients who are members or beneficiaries of UMR's ERISA health plans.

90. As the assignee of its patients, the Murphy Practice is entitled to payment under UMR's ERISA health plans for the medical services provided to UMR's patients by the Murphy Practice.

91. Moreover, even if some of the UMR SFP ERISA health plans prohibited the assignment of benefits to the Murphy Practice, UMR waived any purported anti-assignment provisions, ratified the assignment of benefits to the Murphy Practice, and waived or is estopped from using any purported anti-assignment provisions against the Murphy Practice due to UMR's course of dealing with and statements to the Murphy Practice as an out-of-network provider.

92. Upon information and belief, UMR's ERISA health plans require payments of emergent and elective medical expenses incurred by its members and beneficiaries up to the rate of the Murphy Practice's full incurred charges (less in-network patient responsibility amounts) for emergency/urgent care and (less out-of-network patient responsibility amounts) for elective care.

93. The Murphy Practice's incurred charges represent its usual and customary rates for the treatment provided to UMR's plan members or beneficiaries.

94. UMR breached the terms of its ERISA health plans by refusing to make out-of-network payments for charges covered by the plans, in violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

95. These breaches include, among other things, (a) refusing to reimburse the Murphy Practice for the medically necessary testing it provided to UMR's plan members or beneficiaries, as required by the FFCRA, the CARES Act, or the Affordable Care Act; (b) refusing to reimburse the

Murphy Practice for the medically necessary services that it provided to UMR's plan members or beneficiaries, as required by 29 C.F.R. § 590.715-719A(b)(3)(i)(A)-(C); or (c) otherwise refusing to reimburse Murphy Practice the legally required amounts due under the plans for the medically necessary services provided by the Murphy Practice to UMR's plan members or beneficiaries.

96.    On information and belief, UMR's blanket denials of the Murphy Practice's claims for COVID-19 testing and related services or attempted infinitesimal "reimbursements", and unjustifiable records requests, violate the provisions of these ERISA plans and wrongfully deny benefits due under ERISA.

97.    As a result of, among other acts, UMR's numerous procedural and substantive violations of ERISA and other federal statutes, any appeals are deemed exhausted or excused, and the Murphy Practice is entitled to have this Court undertake a *de novo* review of the issues raised in this Complaint.

98.    To the extent that any of UMR's ERISA plans have not followed the requirements of the FFCRA and CARES Act, and do not provide full coverage of COVID-19 testing and related services, they are in violation of the FFCRA, the CARES Act, the Affordable Care Act and ERISA.

99.    To the extent that any of UMR's ERISA plans do provide COVID-19 testing benefits as required by the FFCRA and the CARES Act, UMR has wrongfully failed to pay the Murphy Practice as required by the plans, in violation of ERISA.

100.    Based on the provisions of the FFCRA, the CARES Act and Affordable Care Act, discussed above, the Murphy Practice had every expectation that UMR would honor its obligations and reimburse the practice for these COVID-19-related testing services provided to its members or beneficiaries. Indeed, other SFP health plans and SFP administrators similarly situated to UMR honored their obligations to the Murphy Practice.

101.   It is hard to imagine a clearer violation of the FFCRA and the CARES Act, than an insurer or administrator of a SFP who has been provided with proof that one of their beneficiaries was determined by a physician to be in medical need of a COVID-19 test, and provided with proof that the test was performed, yet refuses to pay anything.

102.   By reason of the foregoing, Plaintiffs have been damaged and are entitled to a judgment against UMR in the amount of at least $783,008.57, plus interest and attorneys' fees.

103.   The Murphy Practice is also entitled to declaratory relief to enforce the terms of UMR's SFP ERISA health plans and to clarify its right to future benefits under such plans.


### FOURTH CAUSE OF ACTION
### (ERISA)

104.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained above, as if more fully set forth at length herein.

105.   As assignees and authorized representatives of its patients' claims, the Murphy Practice is entitled to receive protection under ERISA, including (a) a "full and fair review" of all claims denied by UMR; and (b) compliance by UMR with applicable claims procedure requirements.

106.   Based on all of the foregoing, UMR's actions and inactions relating to the claims at issue in this lawsuit are tantamount functionally to a denial of these claims.

107.   For denied claims pursuant to 29 U.S.C. § 1133, an ERISA plan must (a) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and (b) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. § 1133(1) and (2).

108.    ERISA regulations make clear that, in the case of post-service claims submitted pursuant to group health plans, the required notification that the claim has been denied must be issued within a reasonable period of time, but not later than 30 days after receipt of the claim, unless the member or beneficiary is notified that, due to circumstances beyond the plan's control, the plan requires an additional 15 days to issue a required denial notification. 29 C.F.R. § 2560-503.1(f)(2)(iii)(B).

109.    Although UMR is obligated to provide a "full and fair review" of denied and underpaid claims pursuant to 29 U.S.C. § 1133, UMR has failed to do so by, among other things: (a) refusing to provide the specific reason or reasons for the denial or underpayment of claims; (b) refusing to provide the specific plan provisions relied upon to support its denials or underpayments; (c) refusing to provide the specific rule, guideline or protocol relied upon in making the decisions to deny or underpay claims; (d) refusing to describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment codes; (e) refusing to notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits; (f) refusing to provide a statement describing any voluntary appeals procedure available, or a description of all required information to be given in connection with that procedure; (g) refusing to provide the Murphy Practice with the documents and information relevant to UMR's denial of the claims; and (h) refusing to timely issue required notifications that the claims have been denied or underpaid.

110.    By failing to comply with the ERISA claims procedure regulations, UMR has utterly failed to provide a reasonable claims procedure.

111.    Because UMR has failed to comply with the substantive and procedure requirements of ERISA, any administrative remedies are deemed exhausted pursuant to 29 C.F.R. § 2560.503-1(I) and 29 C.F.R. § 590.715-2719(b)(2)(ii)(F)(1).

112.    Exhaustion is also excused because it would be futile to pursue any administrative remedies, because UMR does not acknowledge any legitimate basis for its denials and thus offers no meaningful administrative process for challenging its denials.

113.    The Murphy Practice has been harmed by UMR's failure to provide a full and fair review of appeals submitted and failure to comply with applicable claims procedure regulations under ERISA. 29 U.S.C. § 1133.

114.    The Murphy Practice is entitled to relief under 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief, to remedy UMR's failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claim procedure regulations.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

115.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained above as if more fully set forth herein.

116.    Plaintiffs have submitted numerous claims to UMR for COVID-19-related testing and services provided to members or beneficiaries of UMR's SFP health plans and/or health plans UMR administers.

117.    As discussed above, UMR is obligated to reimburse Plaintiffs for the COVID-19 testing Plaintiffs provided to members or beneficiaries of UMR's SFP health plans.

118.    UMR has failed to reimburse Plaintiffs for the COVID-19 testing and related services Plaintiffs provided to members or beneficiaries of UMR's SFP health plans.

119.    By providing medically necessary COVID-19 testing and related services to UMR's members and beneficiaries, Plaintiffs conferred a benefit upon UMR because Plaintiffs' provision of healthcare services facilitated UMR's obligations to arrange and pay for COVID-19 testing and related services for its members.

120.    UMR benefited from the insurance premiums or funds it received from members and beneficiaries in exchange for out-of-network healthcare coverage.

121.    To satisfy its legal obligations, UMR required the services of Plaintiffs to render testing services to members or beneficiaries of UMR's SFP health plans.

122.    By virtue of the foregoing, UMR has received a benefit, in that Plaintiffs have provided COVID-19 testing and related services to members or beneficiaries of UMR's SFP health plans for which UMR has not paid for.

123.    Moreover, Plaintiffs' COVID-19 testing and related services it provided to members or beneficiaries of UMR's SFP health plans conferred an additional benefit to UMR by decreasing the cost of long-term care as a result of early detection through COVID-19 testing.

124.    UMR knew that Plaintiffs provided the medically necessary testing services in satisfaction of UMR's obligations to its members.

125.    UMR has unjustly failed to reimburse Plaintiffs for the benefit.

126.    UMR's failure to reimburse Plaintiffs was and is to Plaintiffs' detriment.

127.    As a result, Plaintiffs are entitled to a judgment against UMR in the amount of at least $783,008.57, plus interest.

## SIXTH CAUSE OF ACTION
### (Breach of Contract)

128.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained above as

if more fully set forth herein.

129.    Upon information and belief, UMR offers or administers various health plans to its members and/or beneficiaries that it administers as a SFP because it pays the costs of health care services provided by healthcare providers to its members and/or beneficiaries out of its own pockets.

130.    Upon information and belief, these policies provided for the reimbursement of medical care services rendered by providers, such as the Murphy Practice, who are commonly referred to as non-participating providers, who do not have agreements with UMR.

131.    Based on the provisions of the FFCRA and the CARES Act, UMR was required to reimburse Plaintiffs as a non-participating provider for COVID-19 testing and related services to members or beneficiaries of UMR's SFP health plans.

132.    As a result, an implied contract was created between Plaintiffs and UMR.

133.    At all times relevant herein, Plaintiffs were the intended beneficiaries of the policies, which were issued or administered by UMR.

134.    At all times relevant herein, UMR had knowledge that Plaintiffs treated its members or beneficiaries of UMR's SFP health plans and accepted the benefits conferred by Plaintiffs.

135.    The reasonable and customary charges for the services that were rendered to UMR members and beneficiaries is in an amount no less than $845,789.01, of which only $62,780.44. has been paid.

136.    As a result, UMR owes Plaintiff an amount no less than $783,008.57.

137.    Plaintiffs and members of UMR's SFP health plans have fully performed their obligations and conditions precedent under the policies.

138.    Plaintiffs have made a demand upon UMR for payment of at least $783,008.57.

139.   UMR's refusal to make a single payment on the balance is in contravention and in breach of its agreement with the Plaintiffs.

140.   As a result of the aforesaid breach, Plaintiffs have been damaged in an amount no less than $783,008.57.

## SIXTH CAUSE OF ACTION
### (Violations of CUIPA)

141.   Plaintiffs repeat, reiterate and re-allege each and every allegation contained above as if more fully set forth herein.

142.   UMR's actions constitute unfair claims settlement practices in violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816.

143.   UMR's acts and omissions offend public policy as established by the Connecticut Unfair Insurance Practices Act.

144.   UMR's acts are immoral, unethical, oppressive, and unscrupulous, with respect to their affects upon patients and providers, including Plaintiffs.

145.   UMR's acts are causing substantial injury to patients and providers, including Plaintiffs who continue to provide critical COVID-19 testing and related services.

146.    UMR's acts are causing substantial injury to Plaintiffs.

147.   UMR's acts have caused Plaintiffs to suffer an ascertainable loss of money and/or property.

148.   Plaintiffs are entitled to compensation for the ascertainable loss they suffered as a result of UMR's acts.

## SEVENTH CAUSE OF ACTION
### (Violations of CUTPA)

149.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained above as if more fully set forth herein.

150.    UMR's acts represent a uniform practice of UMR's administration of the SFP it administers.

151.    UMR's acts constitute an unfair trade practice.

152.    UMR has engaged in the aforementioned unfair trade practices with such frequency as to indicate a general business practice.

153.    Despite Plaintiffs repeated efforts to obtain proper payment on the claims, UMR has refused to enter into a meaningful dialogue with Plaintiffs regarding the services rendered to members of UMR's SFP health plans.

154.    Instead, UMR has flatly denied the claims itself or attempted to make fractional reimbursements, without sufficient investigation and/or lacking in any reasonably arguable basis.

155.    UMR has denied each claim submitted by the Murphy Practice in order to strangle and ultimately force the Murphy Practice to accept dramatically reduced reimbursement rates for the claims.

156.    UMR is well aware that the Murphy Practice's ability to continue to operate these necessary COVID-19 testing sites is severely hampered by withholding payment for COVID-19 testing and related services provided by the Murphy Practice to UMR members and/or beneficiaries.

157.    This is precisely UMR's intent.

158.    Plaintiffs have exhausted all attempts to appeal causing this litigation to ensue.

159.    UMR's acts are a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

160.   UMR's acts are wanton and reckless given the harm they have caused and will continue to cause Plaintiffs, and UMR knew or should have known of the wrongfulness of its acts and that such severe harm would have resulted from such acts.

161.   UMR acted with reckless indifference to the rights of others, including Plaintiffs.

162.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages, punitive damages, and attorney's fees against UMR pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g.

**WHEREFORE**, Plaintiffs demand judgment as follows:

a)   On the First Count, a judgment against UMR, awarding the Murphy Practice compensatory damages in an amount to be determined at trial, such amount being no less than $783,008.57, plus pre-judgment and post-judgment interest;

b)   On the Second Count, a judgment against UMR, awarding the Murphy Practice compensatory damages in an amount to be determined at trial, such amount being no less than $783,008.57, plus pre-judgment and post-judgment interest;

c)   On the Third Count, a judgment against UMR, awarding the Murphy Practice compensatory damages in an amount to be determined at trial, such amount being no less than $783,008.57, plus pre-judgment and post-judgment interest;

d)   On the Fourth Count, awarding the Murphy Practice relief under 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief, to remedy UMR's failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claim procedure regulations;

e)   On the Fifth Count, a judgment against UMR, awarding the Murphy Practice compensatory damages in an amount to be determined at trial, such amount being no less than $783,008.57, plus pre-judgment and post-judgment interest;

f)   On the Sixth Count, a judgment against UMR, awarding the Murphy Practice compensatory damages in an amount to be

determined at trial, such amount being no less than $783,008.57, plus pre-judgment and post-judgment interest;

g)    On the Seventh Count, awarding the Murphy Practice compensatory damages in an amount to be determined at trial, such amount being no less than $783,008.57, punitive damages, and attorney's fees against UMR pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g

h)    On all Counts, punitive damages, in an amount to be determined at trial, pursuant to C.G.S. § 42-110g(a);

i)    On all Counts, Plaintiffs' costs and reasonable attorney's fees in bringing this action, pursuant to C.G.S. § 42-110g(d); and

j)    Such other and further relief as the Court may deem equitable, just and proper.

Dated: New Haven, Connecticut
        January 14, 2022

HARRIS BEACH PLLC
*Attorneys for Plaintiffs*

By: /s/ Roy W. Breitenbach
        Roy W. Breitenbach
        Daniel S. Hallak
The Omni
333 Earle Ovington Boulevard, Suite 901
Uniondale, New York 11553
(516) 880-8484

195 Church Street, #18
New Haven, Connecticut 06510
(203) 784-3159

TO:
        UMR, Inc.
        115 W Wausau Avenue
        Wausau, Wisconsin 54401