UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MURPHY MEDICAL ASSOCIATES, LLC; DIAGNOSTIC AND MEDICAL SPECIALISTS OF GREENWICH, LLC; and STEVEN A.R. MURPHY, M.D., <br><br> *Plaintiffs*, <br><br> *v.* <br><br> UNITED MEDICAL RESOURCES INC., <br><br> *Defendant.* | Civil No. 3:22cv83(JBA) <br><br><br><br><br> March 29, 2023 |

**RULING ON DEFENDANT'S MOTION TO DISMISS**

Plaintiffs Murphy Medical Associates, LLC; Diagnostic and Medical Specialists of Greenwich, LLC; and Steven A.R. Murphy, M.D. (collectively "Plaintiff" or "Murphy") bring this action against Defendant United Medical Resources, Inc. ("UMR"), alleging violations of the Families First Coronavirus Response Act ("FFCRA") and Coronavirus Aid, Relief and Economic Security Act ("CARES Act") (Count One), the Affordable Care Act ("ACA") (Count Two), the Employee Retirement Income Security Act of 1974 ("ERISA") (Counts Three and Four), unjust enrichment (Count Five), breach of implied contract (Count Six), the Connecticut Unfair Insurance Practices Act ("CUIPA") (Count Seven) and the Connecticut Unfair Trade Practices Act ("CUTPA") (Count Eight). (Compl. [Doc. # 1].)[1] Defendant moves to dismiss the Complaint in its entirety. (Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s

---

[1] The Complaint erroneously lists two separate counts as the "Sixth Cause of Action," both the count for Breach of Implied Contract and the count for Violations of CUIPA. (Compl. at pp. 21, 23). As a result, the final count – for Violations of CUTPA – is erroneously labeled Count Seven even though it is actually the eighth and final count. (*Id.* at p. 24.) For the sake of clarity, this order refers to the counts in the order in which they are listed in the Complaint. Therefore, the count for Breach of Implied Contract is Count Six, the count for Violations of CUIPA is Count 7, and the count for Violations of CUTPA is Count 8.

Mem.") [Doc. # 17-1].) For the reasons that follow, the Courts GRANTS in part and DENIES in part Defendant's motion.

## I.   Facts Alleged

The Complaint alleges that Murphy operated COVID-19 testing sites throughout Connecticut and parts of New York. (Compl. ¶ 31.) Murphy's undertaking viewed symptomatic patients or those exposed to COVID-19 as needing to be tested for COVID-19 "as well as other respiratory viruses and infections[.]" (*Id.* ¶ 239.) Plaintiff eventually purchased an advanced BioFire Film Array System with COVID-19 testing capability that "allows healthcare providers to quickly identify patients with common respiratory pathogens, as well as those with COVID-19, using one simple test." (*Id.* ¶ 37.) In addition, Murphy "when medically appropriate…conducted a thorough medical history and basic examination on patients who seek COVID-19 testing." (*Id.* ¶ 43.) Murphy also "conducted telemedicine visits with the patients to check on their conditions and determine whether further medical intervention was needed." (*Id.* ¶ 44.)

Murphy alleges that it has "billed UMR approximately $845,789.01 for over 780 claims relating to COVID-19 testing and related services provided to UMR members and/or beneficiaries, yet has only been reimbursed approximately $62,780.44." (*Id.* ¶ 52.) Murphy alleges that UMR "either ignored or failed to engage in a meaningful dialogue regarding the claims and, instead, continued to send denials or send fractional reimbursement checks to the Murphy Practice." (*Id.* ¶ 55.)

## II.   Legal Standard

When deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the plaintiff has stated a legally cognizable claim by allegations that, if true, would plausibly show that the plaintiff is entitled to relief, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), by assuming all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *See Crawford v. Cuomo*, 796 F.3d 252, 256 (2d

Cir. 2015). However, this principle does not extend to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Because "only a complaint that states a plausible claim for relief survives a motion to dismiss," *Iqbal*, 556 U.S. at 679, a complaint must contain "factual amplification . . . to render a claim plausible*." Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). A complaint that only "offers 'labels and conclusions'" or "naked assertions devoid of further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

## III.    Discussion

### A.    Count One: Violation of FFCRA and CARES Act

Plaintiff alleges that UMR violated the FFCRA and the CARES Act ("the Coronavirus Legislation") by failing to reimburse it for COVID-19 testing related services. (Compl. ¶¶ 66-74.) It maintains that "[a] private right of action can readily be inferred both from the language and context" of these Acts. (Pl.'s Opp'n [Doc. # 33] at 12.) UMR points to this Court's decision in *Murphy Medical v. Cigna*, which rejected the argument Murphy makes here that such a cause of action exists. (Def.'s Mem. at 8, citing *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 3:20CV1675(JBA), 2022 WL 743088, at *6 (D. Conn. Mar. 11, 2022), *on reconsideration*, No. 3:20CV1675(JBA), 2022 WL 10560321 (D. Conn. Oct. 18, 2022).)

By way of background, Congress passed the FFCRA and the CARES Act, requiring group health insurance plans to cover the costs of SARS-CoV-2 tests at no cost to a patient. The FFCRA states, in relevant part:

SEC. 6001. COVERAGE OF TESTING FOR COVID–19.

(a) IN GENERAL. —A group health plan and a health insurance issuer offering group or individual health insurance coverage . . . *shall provide coverage, and shall not impose any cost sharing (including deductibles, copayments, and coinsurance) requirements or prior authorization or other medical management requirements*, for the following items and services furnished during any portion of the emergency period . . . beginning on or after the date of the enactment of this Act:

(1) In vitro diagnostic products . . . *for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19 that are approved, cleared, or authorized* . . . and the administration of such in vitro diagnostic products. . . .

(2) Items and services furnished to an individual during health care provider office visits (which term in this paragraph includes in-person visits and telehealth visits), urgent care center visits, and emergency room visits that result in an order for or administration of an in vitro diagnostic product described in paragraph (1), but only to the extent such items and services relate to the furnishing or administration of such product or to the evaluation of such individual for purposes of determining the need of such individual for such product.

(b) ENFORCEMENT.—The provisions of subsection (a) shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury to group health plans and health insurance issuers offering group or individual health insurance coverage as if included in the provisions of part A of title XXVII of the Public Health Service Act, part 7 of the Employee Retirement Income Security Act of 1974, and subchapter B of chapter 100 of the Internal Revenue Code of 1986, as applicable.

(c) IMPLEMENTATION.—The Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury may implement the provisions of this section through sub-regulatory guidance, program instruction or otherwise.

(emphasis added).

The CARES Act provides:

SEC. 3201. COVERAGE OF DIAGNOSTIC TESTING FOR COVID-19

Paragraph (1) of section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) is amended to read as follows:

"(1) An in vitro diagnostic test defined in section 809.3 of title 21, Code of Federal Regulations[2] (or successor regulations) for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19, and the administration of such a test, that—

---

[2] This regulation defines in vitro diagnostic products as "those reagents, instruments, and systems intended for use in the diagnosis of disease or other conditions, including a determination of the state of health, in order to cure, mitigate, treat, or prevent disease or its sequelae." 21 C.F.R. § 809.3.

4

"(A) is approved, cleared, or authorized under section 510(k), 513, 515, or 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360(k), 360c, 360e, 360bbb–3);

"(B) the developer has requested, or intends to request, emergency use authorization under section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb–3), unless and until the emergency use authorization request under such section 564 has been denied or the developer of such test does not submit a request under such section within a reasonable timeframe;

"(C) is developed in and authorized by a State that has notified the Secretary of Health and Human Services of its intention to review tests intended to diagnose COVID–19; or

"(D) other test that the Secretary determines appropriate in guidance."

SEC. 3202. PRICING OF DIAGNOSTIC TESTING.

(a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee *shall reimburse the provider* of the diagnostic testing *as follows*:

(1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.

(2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer *shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website*, or such plan or issuer may negotiate a rate with such provider for less than such cash price.

(emphasis added).

"[P]rivate rights of action to enforce federal laws must be created by Congress." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014) (quoting *Alexander v. Sandoval,* 532 U.S. 275, 286 (2001)). A private right of action is created either expressly "or, more rarely, by implication." *Id.* To determine if Congress intended to imply a private right of action, courts consider "the text and structure of the statute," *id.*, to "determine whether it

displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 288 n.7 ("[T]he interpretative inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action."). Further, to help "illuminate" the analysis of Congressional intent, *ABB AG*, 768 F.3d at 170, courts consider:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash,* 422 U.S. 66, 78 (1975). Without Congressional intent for a private right and remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286-87.

Mindful that the Supreme Court "has increasingly discouraged the recognition of implied rights of actions without a clear indication of congressional intent," *Duplan v. City of N.Y.*, 888 F.3d 612, 621 (2d Cir. 2018), this Court previously held in *Murphy v. Cigna* that "neither § 6001 of the FFCRA nor § 3202 of the CARES Act contains a private right of action." *Murphy v. Cigna*, 2022 WL 743088, at *6.

In an attempt to reach a different result in this case, Murphy points to two letters from members of Congress which were not a part of the record in *Cigna*. (Pl.'s Opp'n at 18-19.) These letters, however, do not express any intent by the members of Congress to create a private right of action. Rather, as recently found by Judge Vanessa L. Bryant in another case brought by Murphy, one of the letters "appears to suggest the contrary is true, because it is directed to the Department heads and 'urges [them] to take immediate action.' If these members of Congress believed that health care providers had a private cause of action, there

6

is no reason for them to ask the Department heads to take action to enforce the rights of providers." *Murphy Medical v. Centene Corporation*, No. 3:22-CV-504-VLB, 2023 WL 2384143, at *7 (D. Conn. Mar. 6, 2023). The other letter also expresses concerns about claims for Covid-19 testing being denied, but again "nothing contained in this letter indicates that these members of Congress believed the FFCRA or the CARES Act created a private right of action to health care providers providing COVID-19 testing." *Id.* Nothing in these letters changes the analysis from that set forth in *Murphy v. Cigna*, and absent any private right of action under the Coronavirus Legislation, Count I is dismissed.

### B.  Count Two: ACA

UMR similarly urges dismissal of Count Two on grounds that there is no private right of action under ACA. (Def.'s Mem. at 14-16). Plaintiff argues for a cause of action because Section 2719A of the Affordable Care Act, 42 U.S.C. § 300gg-19a, requires coverage for emergency services, which Plaintiff maintains encompasses the services at issue. (Pl.'s Opp'n at 32.) A number of federal courts have held that this provision of ACA does not provide a private cause of action. *See Murphy Medical v. Centene*, 2023 WL 2384143, at *7-8; *Gotham City Orthopedics, LLC v. Aetna, Inc.*, No. 20-cv-19634-KM, 2021 WL 9667963, *12 (D.N.J. Sept. 10, 2021); *Somerset Orthopedic Assocs., P.A. v. Horizon Healthcare Servs., Inc.*, No. 19-8783, 2021 WL 3661326, at *8 (D.N.J. Aug. 18, 2021). Murphy unsuccessfully attempts to distinguish these decisions by arguing that here, ACA in concert with the Coronavirus Legislation merits finding a private right of action (Pl.'s Opp'n at 32-33), without adequately articulating why, under the facts of this case, this Court should reach a conclusion different from the other district courts' conclusions that no private right of action exists. *See Murphy Medical v. Centene*, 2023 WL 2384143, at *8. Count II will also dismissed.

### C.  Count Three: ERISA Benefits

Plaintiff alleges in Count Three that UMR's "blanket denials of the Murphy Practice's claims for COVID-19 testing and related services or attempted infinitesimal

'reimbursements', and unjustifiable records requests, violate the provisions of these ERISA plans and wrongfully deny benefits due under ERISA." (Compl. ¶ 96.) UMR moves to dismiss this count because (1) there is a lack of standing, (2) UMR is not a proper defendant, (3) Plaintiff makes no plausible claim for denial of benefits, and (4) Plaintiff fails to allege exhaustion of administrative remedies.

### 1. Standing

UMR argues that Plaintiff's standing is deficient because the Complaint "does not identify a single individual who allegedly executed an assignment, nor does it identify a single plan under which a member's rights allegedly were assigned. It does not allege what any of those supposed assignments actually say." (Def.'s Mem. at 19.) Murphy defends its standing because it received assignment of benefit forms from patients and, on an alternative basis, argues that Congress has given it standing to sue under ERISA through the Coronavirus Legislation. (Pl.'s Opp'n at 25.)

Pleadings that quote the "standard form language" of an assignment have been deemed sufficient to withstand a motion to dismiss. *See Premier Health Ctr., P.C. v. UnitedHealth Group*, No. 11-cv-425, 2012 WL 1135608, at *7 (D.N.J. Apr. 4, 2012). Plaintiff need not identify the names of the individuals who executed assignments nor the plans by which they are governed, as these are areas for discovery. *Id*. Here, however, Plaintiff fails to plead any actual language from any purported assignment in the Complaint, merely alleging that "[t]he Murphy Practice generally receives assignment of benefit forms from patients who receive testing services at Murphy testing sites. Other patients that registered electronically assigned their benefits to the Murphy Practice." (Compl., ¶ 46.) However, Murphy does offer example form assignment language in exhibits to its opposition brief. (Pl.'s Opp'n at 25; Murphy Decl. [Doc. # 23] ¶¶ 31-32.) UMR argues that such extraneous materials cannot cure defective pleadings. (Def.'s Reply [Doc. # 44] at 4-5 n.4). However, the Supreme Court has held that "it is within the trial court's power to allow or to require the

plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). In the absence of any reason not to, the Court will consider the assignment language quoted in Plaintiff's declaration accompanying its opposition to this motion, as providing the sort of "standard form language" the Court deems sufficient to satisfy standing.

### 2.   Whether UMR is a Proper Defendant

Defendant maintains that UMR is not a proper defendant under ERISA § 1132(a)(1)(B) because the Second Circuit has held that "[i]n a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989). But the Second Circuit has subsequently held that "'when a claims administrator exercises total control over claims for benefits under the terms of the plan, that administrator is a logical defendant in the type of suit contemplated by § 502(a)(1)(B)." *See New York State Psychiatric Ass'n v. UnitedHealth Grp.*, 798 F.3d 125, 132 (2d Cir. 2015). UMR misdirects its claim that the Complaint fails to allege that UMR exercised such a degree of control, because the Complaint alleges that as an "administrator, UMR acts in a role similar to commercial health insurers by reimbursing providers for services provided to patients covered by health plan(s) that UMR administers." (Compl. ¶ 16.) This plausibly shows that UMR does exercise the requisite control over the claims process to make it a proper defendant under Count Three.

### 3.   Whether Plaintiff Alleges a Plausible Claim

UMR maintains that Plaintiff fails to allege facts establishing a plausible claim for wrongful denial of benefits, because Plaintiff has not identified any plan at issue or what plan language required payment of the benefits they seek. (Def's Mem. at 21-22.) It is true that, ordinarily, where a plaintiff has neither identified the plan at issue nor the plan language violated, such a claim is properly dismissed. *See, e.g.*, *N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 135 (2d Cir. 2015) (affirming the dismissal of ERISA claims

where the plaintiff failed to allege, inter alia, "her patients' plans or the terms of their plans"). Here, however, the reimbursement obligation derives from the Coronavirus Legislation, which effectively modified the terms of ERISA plans to provide SARS-CoV-2 tests at no cost to a patient. Thus, the relevant plans imposed UMR's obligation to reimburse COVID-19 diagnostic testing in accordance with federal law and specific plan language or the individual assignor-beneficiaries is not required.

   4. *Administrative Exhaustion*

  UMR argues that Murphy failed to sufficiently plead that it has exhausted administrative remedies before filing suit, as required under ERISA. (Def.'s Mem. at 22-24.) Plaintiff maintains that exhaustion is an affirmative defense to be pleaded by Defendant, and alternatively, "1) exhaustion is excused; and/or (2) the pursuit of those remedies would have been futile." (Pl.'s Opp'n at 28.)

  This Circuit has recognized a 'firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.'" *Paese v. Hartford Life & Accident Ins. Co*., 449 F.3d 435, 443 (2d Cir. 2006). The purpose of the exhaustion requirement is to "help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993). However, where a plaintiff's participation in a formal administrative process is futile, these purposes are no longer served, and "a court will release the claimant from the requirement." *Id.* Where, as here, a plaintiff alleges it faced widespread automatic denials of hundreds of claims, it is hard to contemplate how the purposes of exhaustion could be effectively served. *See Murphy v. Cigna*, 2022 WL 743088 at *9 ("Plaintiff encountered such massive, repeated, and automatic denials, it would be futile for it to administratively exhaust each individual claim with any expectation of successful result.") UMR's motion to dismiss Count III is denied.

### D.  Count Four

Plaintiff also seeks "declaratory and injunctive relief" in Count Four to force UMR "to comply with applicable claim procedure regulations" under ERISA. (*Id.* ¶ 114.)

> "[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief," *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996), and if the equitable relief a plaintiff seeks "falls comfortably within the scope of § 502(a)(1)(B), which allows a plan participant 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan,'" then there is no need to "allow equitable relief under § 502(a)(3)." *Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006)[.]

*Murphy v. Cigna*, 2022 WL 743088, at *10.

Because Plaintiff is provided adequate relief under Count Three for its ERISA claim for denial of benefits, Count Four is dismissed.

### E.  ERISA Pre-Emption of State Law Claims

UMR argues that Murphy's state law claims are preempted by ERISA. "Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)). The Complaint alleges that "a significant number of claims the Murphy Practice has submitted to UMR relate to patients enrolled in UMR's health plans or health plans UMR administers subject to ERISA." (Compl. ¶ 31.) It makes no reference to any non-ERISA plans. Therefore, all state law claims based on unjust enrichment, breach of implied contract, CUIPA, and CUTPA are preempted and dismissed without prejudice to amend to specifically identify any non-ERISA plans at issue.[3]

---

[3]The existence of non-ERISA plans was discussed in *Murphy v. Cigna*, and Murphy was granted leave to amend upon reconsideration. *See* 2022 WL 10560321, at *2 (D. Conn. Oct. 18, 2022). Perplexingly, Plaintiff has made no attempt to amend this Complaint similarly.

**IV.     Conclusion**

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. # 17] is GRANTED as to Counts One, Two, Four, Five, Six, Seven, and Eight and DENIED as to Count Three. The dismissal of Counts Five, Six, Seven, and Eight is without prejudice. The dismissal of Counts One, Two, and Four is with prejudice. Plaintiff may file an Amended Complaint within 14 days of this ruling. Absent such action, dismissal of Counts Five, Six, Seven, and Eight will be with prejudice.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of March 2023

---

However, if Plaintiff in this case is intending to pursue claims under non-ERISA plans, it must so indicate by filing an amended complaint within 14 days of this ruling, specifically identifying any such non-ERISA claims it intends to pursue.