**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MURPHY MEDICAL ASSOCIATES, LLC; DIAGNOSTIC AND MEDICAL SPECIALISTS OF GREENWICH, LLC; and STEVEN A.R. MURPHY

*Plaintiffs*,

v.

UNITED MEDICAL RESOURCES, INC.,

*Defendant*.

No. 3:22-CV-00083-MPS

**RULING ON DEFENDANT'S MOTION TO DISMISS**

## I. INTRODUCTION

During the COVID-19 pandemic, Plaintiffs Murphy Medical Associates, LLC, Diagnostic and Medical Specialists of Greenwich, LLC, and Steven A.R. Murphy, M.D. (collectively, "Murphy Medical") operated COVID-19 testing sites in New York and Connecticut. Murphy Medical alleges that health plan administrator United Medical Resources, Inc. ("UMR") failed to reimburse it for COVID-19 testing and related healthcare that UMR members received at Murphy Medical's testing sites. The plaintiffs' amended complaint asserts claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), Connecticut's Unfair Trade Practices Act ("CUTPA"), and Connecticut common law. UMR moves to dismiss Murphy Medical's state law claims. For the reasons that follow, I grant in part and deny in part UMR's motion to dismiss.

## II. BACKGROUND

The following facts, drawn from the plaintiffs' amended complaint and exhibits, are accepted as true for the purpose of this motion.[1]

### A. Factual Background

During the COVID-19 pandemic, Murphy Medical set up drive-through COVID-19 testing sites in Connecticut and New York. ECF No. 63 at 5 ¶ 25. When Murphy Medical tested for COVID-19, it also tested for other respiratory viruses that "could possibly cause the same or similar symptoms as COVID-19, or could possibly co-exist with COVID-19." *Id.* at 6 ¶ 29. For patients who believed they had recovered from COVID-19, Murphy Medical offered COVID-19 antibody blood tests. *Id.* at 9 ¶ 41. If a patient tested positive for COVID-19, or had COVID-19 antibodies, Murphy Medical would perform comprehensive blood testing to "determine the potentially life-threatening damage that the virus was doing or had done to the body's organs or systems." *Id.* at 9 ¶ 42. "This blood testing include[d] checking for certain protein levels, vitamin levels, [and] hormone levels . . . that w[ould] provide key insights into the operation of various vital organs and systems." *Id.* Murphy Medical also provided certain other services, including telemedicine counseling to check in on patients and advise patients about "how to observe universal precautions and proper nutrition during the pandemic, [among] other important issues." *Id.* at 9-10 ¶¶ 43-44.

UMR is an administrator of health plans, which it administers as a "self-funded payer," i.e., it pays the costs of health care services out of its own funds. *Id.* at 3-4 ¶¶ 14-15. UMR does not have a contract with Murphy Medical, so it considers Murphy Medical an "out-of-network"

[1] In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I consider not only "facts alleged in the complaint" but also "documents attached to the complaint as exhibits." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

provider. *Id.* at 12 ¶¶ 53-54, 17 ¶ 84. Under the Families First Coronavirus Response Act (the "FFCRA") and the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), UMR was required to reimburse out-of-network providers for COVID-19 testing and related services. *Id.* at 12-13 ¶¶ 57-61. UMR also entered into an agreement with the state of Connecticut "wherein it explicitly agreed to cover COVID-19 testing fees for its members." *Id.* at 31 ¶ 155.

Hundreds of UMR members received COVID-19 testing and related services from Murphy Medical. *Id.* at 15 ¶ 69; ECF No. 63-1. Many of these patients executed assignment of benefits forms, which assigned to Murphy Medical "benefits to which [the patient] may be entitled . . . for [his or her] medical care," and further assigned to Murphy Medical the patient's "right to commence a lawsuit under ERISA or other applicable state or federal law to recover such . . . benefits." ECF No. 63 at 17-18 ¶ 85 (alterations omitted). "Most, but not all" of the patients whom Murphy Medical treated were enrolled in UMR health plans governed by ERISA. *Id.* at 16 ¶ 76.

Murphy Medical submitted more than 780 claims to UMR for COVID-19 testing and related services, typically charging at least $1,000 for COVID-19 tests and $2,000 for antibody tests. *See id.* at 15 ¶ 69; ECF No. 63-1 (listing all charges for UMR beneficiaries). These charges are its "usual and customary rates" for such services. ECF No. 63 at 28 ¶ 139.

UMR either denied claims for COVID-19 testing and related services or made "frivolous and bad faith medical records and audit requests." *Id.* at 14 ¶ 64, 15 ¶ 71. In some instances, UMR requested records, but then denied claims before Murphy Medical had a reasonable opportunity to provide those records. *Id.* at 15 ¶ 73. Although Murphy Medical believed the records requests were improper, it responded by providing UMR with a test order form and test

results. *Id.* at 15 ¶ 72. After receiving these records, UMR still refused to reimburse Murphy Medical; instead, it would ask for more medical records. *Id.* ¶ 73. Ultimately, UMR "den[ied] or fractionally [paid]" the COVID-19 testing costs. *Id.* at 35 ¶ 193. And it "routinely . . . refused to pay" for services related to COVID-19 testing, including "the patient's visit to a [Murphy Medical] location, the consultation regarding testing, the taking of samples, the related testing ordered during that visit, and the telemedicine follow-ups." *Id.* at 16 ¶ 74. All told, Murphy Medical billed UMR approximately $845,789.10 for COVID-19 testing and related services; UMR reimbursed approximately $62,780.44 of this amount. *Id.* at 26 ¶ 25.

UMR's benefit denials contained "incomprehensible gibberish" that failed to notify Murphy Medical of UMR's reason for denying the claim. *Id.* at 21 ¶ 101. "A recent set of denials from UMR read: 'Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement. Usage: This adjustment amount cannot equal the total service or claim charge amount; and must not duplicate provider adjustment amounts (payments and contractual reductions) that have resulted from prior payer(s) adjudication' . . . . One recent denial of a claim where UMR had never requested records gave as the reasons for denial 'Missing patient medical record for this service.'" *Id.* at 20 ¶¶ 97, 99 (emphasis omitted). Murphy Medical appealed each denial, but those appeals were "summarily denied." *Id.* at 2 ¶ 5. UMR also "issued false Explanations of Benefits (EOB) to the patients stating that the patient, not UMR, was obligated to pay for [Murphy Medical healthcare] services." *Id.* at 32 ¶ 164.

**B. Procedural History**

Murphy Medical filed this case, alleging that UMR (1) violated the FFCRA, the CARES Act, and the Affordable Care Act ("ACA"), (2) violated ERISA by breaching the terms of its health plans and wrongfully denying benefits, (3) was unjustly enriched, (4) breached an implied

contract with Murphy Medical, (5) violated the Connecticut Unfair Insurance Practices Act ("CUIPA"), and (6) violated the Connecticut Unfair Trade Practices Act ("CUTPA"). ECF No. 1. After UMR moved to dismiss all of Murphy Medical's claims, Judge Arterton determined that the FFCRA, CARES Act, and ACA did not create a private right of action, and she dismissed those claims with prejudice. ECF No. 59 at 3-7. She denied UMR's motion to dismiss Murphy Medical's ERISA claims, *id.* at 7-10, but dismissed without prejudice Murphy Medical's state law claims, concluding that those claims were preempted by ERISA, since Murphy Medical failed to allege that any UMR members had non-ERISA health plans, *id.* at 11.

This case was then reassigned to me, ECF No. 62, and Murphy Medical filed an amended complaint, ECF No. 63. The amended complaint reasserts Murphy Medical's ERISA claims. ECF No. 63 at 26-28. It also alleges that certain UMR members are covered by non-ERISA plans, *id.* at 21-22, and, related to those members, it asserts claims for breach of implied contract, unjust enrichment, and violations of CUTPA, *id.* at 24-26, 28-36. UMR has moved to dismiss all of Murphy Medical's state law claims. ECF No. 68.

## III. LEGAL STANDARD

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). I accept as true all of the complaint's factual allegations when evaluating a motion to dismiss, *id.*, and must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co*., 517 F.3d 104, 115 (2d Cir. 2008). However, "threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).

This case presents several questions of unsettled state law. "A federal court faced with a question of unsettled state law must do its best to guess how the state court of last resort would decide the issue." *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850 (2d Cir. 1992). If the state's highest court has not decided the issue, "the best indicators of how it would decide are often the decisions of lower state courts." *Id.* Decisions from lower state courts are not binding, but "they do have great weight in informing the court's prediction on how the highest court of the state would resolve the question." *Id.* (internal quotation marks omitted).

## IV.    DISCUSSION

### A.  CUTPA Claim

The amended complaint alleges that UMR engaged in unfair trade practices in violation of CUTPA by (1) violating several provisions of the Connecticut Unfair Insurance Practices Act ("CUIPA"), (2) violating the FFCRA and the CARES Act, (3) violating Connecticut's Surprise Billing Law, and (4) directing Murphy Medical to violate Connecticut's Surprise Billing Law. UMR moves to dismiss the CUTPA claim.

CUTPA prohibits the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). A plaintiff bringing a CUTPA claim must show that "(1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; . . . and (2) [it] has suffered an ascertainable loss of money or property as a result of the defendant's acts or practices." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217 (2008).

To determine whether a defendant has engaged in an "unfair or deceptive act or practice," Connecticut courts have adopted the criteria known as the "cigarette rule," i.e.,

> (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers, competitors or other businesspersons."

*Am. Car Rental, Inc. v. Comm'r of Consumer Prot.*, 273 Conn. 296, 305-06 (2005). A practice may violate CUTPA without meeting all three criteria—i.e., a practice "may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . ." *Id.* at 306. Under the first criteria, "a breach of public policy . . . may result from violation of another statute." *Petrolito v. Arrow Financial Services, LLC*, 221 F.R.D. 303, 308 (D. Conn. 2004) (citation and internal quotation marks omitted). I discuss below whether Murphy Medical has adequately alleged a cognizable claim under each of its CUTPA theories.

    1.  <u>Alleged CUIPA Violations</u>

CUIPA "specifically prohibits unfair business practices in the insurance industry and defines what constitutes such practices in that industry." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 317 Conn. 602, 623 (2015). While CUIPA "does not authorize a private right of action . . . . individuals may bring an action under CUTPA for violations of CUIPA." *Id.* (citations and internal quotation marks omitted). "In order to sustain a CUIPA cause of action under CUTPA, a plaintiff must allege conduct that is proscribed by CUIPA." *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 625 (2006). Murphy Medical alleges that UMR violated CUIPA by engaging in unfair settlement practices under Conn. Gen. Stat. § 38a-816(6). ECF No. 63 at 31-32 ¶¶ 158-62. Murphy Medical also alleges that UMR violated § 38a-816(15), which prohibits insurers from

"fail[ing] . . . to pay . . . health claims, including . . . claims for payment or reimbursement to health care providers" within a prescribed time period. *Id.* at 32 ¶ 167.

UMR argues that Murphy Medical's CUTPA theory based on alleged violations of CUIPA should be dismissed because (1) it "[has] not alleged a right of subrogation or that there has been a judicial determination of the insured's liability," ECF No. 76 at 6, (2) it has not pled its unfair settlement practices claims "with sufficient particularity to establish that UMR engaged in a 'general business practice' as required by CUIPA," *id.* at 7, and (3) it has "fail[ed] to allege facts plausibly showing how UMR's conduct violated [the CUIPA provisions cited in the complaint]," ECF No. 68-1 at 16 (citation omitted). I deny UMR's motion to dismiss Murphy Medical's CUTPA claim based on CUIPA violations, but I narrow that portion of the claim because I find that the complaint fails to adequately allege some of the claimed CUIPA violations.

(i) Subrogation/Judicial Determination of Liability

UMR argues that Murphy Medical has no cause of action for violations of CUIPA, because it is not party to the contract between UMR and its members, and it has not alleged a right of subrogation or that there has been a judicial determination of UMR's liability. To support this argument, UMR relies on *Carford v. Empire Fire and Marine Ins. Co.*, 94 Conn. App. 41 (2006). In *Carford*, victims of a car accident brought a CUTPA action against the other driver's insurer, claiming the insurer engaged in unfair settlement practices under CUIPA. *Id.* at 42-43. The Appellate Court held that "the right to assert a private cause of action for CUIPA violations through CUTPA does not extend to third parties absent subrogation or a judicial determination of the insured's liability." *Id.* at 53.

Another court in this district has concluded that *Carford*'s holding does not apply to claims brought by healthcare providers seeking reimbursement from insurers, and I agree. *See NEMS PLLC v. Harvard Pilgrim Health Care of Connecticut Inc.*, 615 F. Supp. 3d 125 (D. Conn. 2022). First, *Carford* did not even construe one of the CUIPA provisions at issue in this case: § 38a-816(15). The *Carford* plaintiffs alleged only that the insurer engaged in unfair settlement practices under § 38a-816(6). *Carford*, 94 Conn. App. at 48. The court found that the language of § 38a-816(6) was "not enlightening . . . as to a third party's right to bring a claim against an insurance company," *id.* at 49, and it determined that the accident victims could not sue for violations of § 38a-816(6) based on other considerations, *id.* at 49-52. By contrast, the language of § 38a-816(15) makes clear that the legislature intended to protect health care providers. That provision states that it is an unfair insurance practice for "an insurer, or any other entity responsible for providing payment to a health care provider pursuant to an insurance policy" to fail to "pay accident and health claims, including, but not limited to, claims for payment or reimbursement to health care providers, within [a specified time period]." *Id.* § 38a-816(15)(A). An insurer that violates this provision "must pay the claimant or health care provider the amount of such claim plus interest at the rate of fifteen per cent per annum." *Id.* Thus, § 38a-816(15) is particularly concerned with failure to pay "claims for payment or reimbursement to health care providers," and imposes a punitive interest rate on unpaid claims. Because health care providers are the party most directly harmed by violations of § 38a-816(15), it is unlikely that the legislature intended to bar health care providers from bringing CUTPA claims based on those violations. So I find that Murphy Medical can assert a CUTPA claim based on violations of § 38a-816(15), without subrogation or judicial determination of responsibility.[2]

---

[2] I note that Judge Nagala reached a different conclusion in *NEMS*, finding that a healthcare provider lacked statutory standing to bring a CUTPA claim for violations of § 38a-816(15). 615 F. Supp. 3d at 140. She reasoned

Nor does *Carford*'s holding apply to claims that health care providers bring against insurance companies under § 38a-816(6). Although the decision includes some broad language about "third parties," the court's formulation of the "critical question" makes clear that its holding is tied to the underlying facts involving accident victims who bring claims against insureds: "The critical question . . . is whether under CUTPA, a third party claimant may, prior to obtaining a judgment against a tortfeasor, assert a CUIPA violation against the insurer alleging unfair claim settlement practices," 94 Conn. App. at 48-49 (footnote omitted). Likewise, the court's explanation of its holding shows that it was aiming at situations in which third parties had initiated claims against insureds: "To hold otherwise would create confusion, increased and multiple litigation both generally and within specific cases, the potential coercion of settlements when the insured's liability has not been and may never be established, and an inherent conflict of interest." *Id.* at 53 (footnote omitted). As this language recognizes, accident victims must generally prove that the insured is liable in tort before the insurer must pay anything. Lifting that requirement to allow immediate suits against insurers for violations of § 38a-816(6), the *Carford* court found, might lead accident victims simultaneously to bring tort claims against the insured and CUTPA claims against the insurance company.

Here, by contrast, there is no suggestion that Murphy Medical has initiated any claims against its patients or that it intends to do so; indeed, Murphy Medical specifically disclaims billing its patients for its COVID-19 testing and related services. ECF No. 65 at 23 ¶ 112. So in

---

that § 38a-816(15) "requires that the insurer failed to pay a health care provider 'pursuant to an insurance policy,'" language she interpreted to mean that the provision is focused on the rights of the insureds under their insurance plan. 615 F. Supp. 3d at 140. I respectfully disagree with that portion Judge Nagala's ruling. § 38a-816(15) references insurance policies only to define the parties, beyond insurers, to which the statutory time limits apply. *See* Conn. Gen. Stat. § 38a-816(15)(A) ("Failure by an insurer, or any other entity responsible for providing payment to a health care provider pursuant to an insurance policy, to pay . . . ."). And as noted, the provision specifically references "claims for payment or reimbursement to healthcare providers." Finally, as health care providers are much more likely than insureds to have a ready incentive to enforce this provision, finding that only insureds may enforce this provision through CUTPA would likely mean this provision would not be enforced through CUTPA.

this case, there will be no "final judgment" against an insured, and no danger of "confusion," "increased and multiple litigation," "coercion of settlement," or "conflict of interest." The policy concerns that drove the holding in *Carford* do not apply in this case.

In addition, Murphy Medical alleges that it has received an assignment of benefits from at least some of its patients, which further distinguishes this case from *Carford*. ECF No. 63 at 27 ¶ 134; ECF No. 63-2 at 4 (form attached as exhibit to complaint, which states that the patient "assign[s] . . . to [Murphy Medical] sufficient monies and/or benefits to which I may be entitled from … insurance carriers," and "further assign[s] to [Murphy Medical] my right to commence a lawsuit under [ERISA] or other applicable federal or state law to recover such monies and/or benefits"). An accident victim can sue an insurer once she has been subrogated to the rights of the insured. *Carford*, 94 Conn. App. at 53. And "subrogation . . . has been said to be synonymous with assignment." *Wasko v. Manella*, 269 Conn. 527, 532 (2004). Nothing in *Carford* precludes a health care provider from bringing a claim against an insurer after receiving a valid assignment of the insured's right to sue.[3]

Finally, since Murphy Medical brings its CUIPA claims through CUTPA, I must also consider the legislature's broad remedial goals in enacting that statute. The Connecticut legislature believed "it was important to incentivize broad [CUTPA] enforcement action by private litigants," and therefore amended CUTPA to permit "*anyone* who has suffered an

---

[3] UMR does not argue that the assignment of benefits clause is invalid or that it is precluded by any anti-assignment clause in the insurance contract. I note that Connecticut's Supreme Court has not determined whether CUTPA claims are generally assignable, but it has found a CUTPA claim to be unassignable where it would undermine the policy set forth in a different statute. *Stearns & Wheeler, LLC v. Kowalsky Bros.*, 289 Conn. 1, 9 (2008) (CUTPA claim arising from alleged wrongful death of defendant's two employees not assignable because it would undermine exclusivity provision of workers compensation statute). But even if the Connecticut Supreme Court holds that CUTPA claims are generally not assignable, it might not apply this rule to claims arising from assignments of benefits (as in this case) or other contractual assignments entered into before litigation was contemplated or initiated, because such assignments do not pose the risks cited in *Stearns* of creating a "market" for "deceptive trade practices claims" that might draw "unscrupulous interlopers and litigious persons." *Id.* at 9 n.12; *see also Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 329 (2d Cir. 2011) ("[W]e have carved out a narrow exception to the ERISA standing requirements to grant standing to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care." (internal quotation marks and alterations omitted)).

ascertainable financial loss as a result of an unfair trade practice to bring a CUTPA action." *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 89 (2019).

For these reasons, *Carford* does not bar Murphy Medical from bringing any portion of its CUTPA claim.

(ii) General Business Practice

Next, UMR argues that Murphy Medical has not adequately pled the portion of its CUTPA claim that asserts violations of § 38a-816(6). To state a claim for unfair settlement practices under § 38a-816(6), Murphy Medical must allege that UMR engaged in acts proscribed by CUIPA "with such frequency as to indicate a general business practice." UMR urges me to reject all of Murphy Medical's unfair settlement practices theories, arguing that Murphy Medical has not adequately alleged a general business practice. ECF No. 76 at 7. I find Murphy Medical's allegations that UMR engaged in similar practices in denying hundreds of Murphy Medical's claims sufficient to allege a general business practice.

Because § 38a-816(6) does not define the term "general business practice," the Connecticut Supreme Court has "looked to the common understanding of the words as expressed in a dictionary." *Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 849 n.8 (1994). In *Lees*, it observed that "'[g]eneral' is defined as 'prevalent, usual or widespread' . . . and 'practice' means 'performance or application habitually engaged in or repeated or customary action.'" *Id.* (internal citations and alterations omitted).

In determining whether a plaintiff has adequately alleged a general business practice, trial courts have considered factors such as:

> [1] the degree of similarity between the alleged unfair practices in other instances and the practice allegedly harming the plaintiff; [2] the degree of similarity between the insurance policy held by the plaintiff and the policies held by other alleged victims of the defendant's practices; [3] the degree of similarity between

> claims made under the plaintiff's policy and those made by other alleged victims under their respective policies; and [4] the degree to which the defendant is related to other entities engaging in similar practices.

*Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 166 (D. Conn. 2014). "Many [Connecticut] trial courts have found the alleged mishandling of various elements of the same claim does not reach the level of a general business practice under CUIPA." *L.A. Limousine, Inc. v. Liberty Mut. Ins. Co.*, 509 F. Supp. 2d 176, 182 (D. Conn. 2007) (compiling cases); *see, e.g.*, *Southridge Cap. Mgmt., LLC v. Twin City Fire Ins. Co.*, No. MMX-04-CV-02-103527-S, 2004 WL 2397300, at *3 (Conn. Super. Ct., Judicial District of Middlesex, Sept. 27, 2004) ("Two inciden[t]s of alleged insurer misconduct concerning the same policy of insurance and the same insured do not present facts that fit the definition of 'a general business practice.'"). In cases brought by insureds, "[a]llegations sufficient to establish a general business practice are typically accomplished by citing to other cases brought by other insureds against the defendant or its affiliates." *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 3:20-cv-01675 (JBA), 2023 WL 3434988, at *2 (D. Conn. May 12, 2013) (internal quotation marks and alterations omitted).

Here, Murphy Medical has made no allegations regarding UMR's treatment of other healthcare providers. ECF No. 63. Instead, it claims that "UMR has wrongfully responded in the same or similar ways" to hundreds of claims submitted by Murphy Medical.[4] *Id.* at 33 ¶ 175; *see also* ECF No. 63-1 (exhibit listing bills UMR has allegedly failed to reimburse fully from March 13, 2020 through June 8, 2021). The question, then, is "whether sheer frequency of denial of [Murphy Medical's] *claims* is sufficient [to allege a general business practice] even without

[4] Murphy Medical specifically alleges that "UMR has wrongfully responded in the same or similar ways to *thousands* of claims submitted by [Murphy Medical]." *Id.* at 33 ¶ 175 (emphasis added). But the amended complaint states that "[Murphy Medical] provided *780* COVID-19-related testing or related services to members or beneficiaries of UMR health plan." *Id.* at 23 ¶ 109 (emphasis added). And an exhibit Murphy Medical attaches to the amended complaint, which purports to be "a complete list of the UMR beneficiaries that presented to [Murphy Medical] for COVID-19 testing and related services," *id.* at 15 ¶ 69, lists approximately 780 claims, ECF No. 63-1. Therefore, I assume for the purposes of this analysis that UMR failed to reimburse around 780 claims.

allegation that the practice goes beyond denial of claims from just one *provider*." *Murphy Med. Assocs*., 2023 WL 3434988, at *3.

As UMR points out, another judge in this district has held that Murphy Medical cannot allege a general business practice without identifying other victims of the insurer's alleged unfair insurance practices. *Id.* I respectfully disagree with Judge Arterton's conclusion in that case. At the motion to dismiss stage, the plaintiff's allegations must raise an inference that the insurer's allegedly unfair practices were "prevalent, usual, or widespread." *Lees*, 229 Conn. at 849 n.8. Here, Murphy Medical alleges that (1) it submitted hundreds of similar claims, (2) over a lengthy period of time, (3) involving different underlying incidents (i.e., different patients or different instances of medical care), and (4) UMR responded very similarly to every claim. In short, Murphy Medical alleges that UMR has engaged in repeated conduct over multiple years in handling hundreds of different claims. This is enough to support an inference that UMR's treatment of Murphy Medical's claims was its "usual" approach to claims for COVID-19 testing and related services.

To be sure, it will not be enough at the proof stage, because UMR's alleged treatment of Murphy Medical might be anomalous: if UMR treated most other health care providers, or even most other labs or other testing facilities differently, then its treatment of Murphy Medical would not be "usual, habitual," or "customary." *See Hartford Roman Cath. Diocesan Corp. v. Interstate Fire & Cas. Co.*, 905 F.3d 84, 96 (2d Cir. 2018) (determining, at summary judgment stage, that proof of "[insurer's] misconduct in nine cases in a limited sample of 57 claims—out of more than 1700 sexual abuse settlements nationwide—does not evidence a 'prevalent, usual, [or] widespread' practice"). But at this stage, I must draw reasonable inferences in Murphy Medical's favor. And it is more reasonable to infer that UMR's similar handling of hundreds of claims over

multiple years reflected its "usual" practice than it is to infer that it was an anomaly. *See SEC v. Syron*, 934 F. Supp. 2d 609, 627 n.4 (S.D.N.Y. 2013) ("Where factual allegations support multiple plausible inferences, the Court cannot decide among those interpretations on a motion to dismiss.").

Courts have not set a high bar for alleging a "general business practice" at the pleadings stage. In cases involving insureds, courts have found that insureds can allege a general business practice by pointing to a small number of cases where insurers treated other victims similarly. *See, e.g.*, *Caporale v. Prudential Ins. Co. of Am.*, No. 3:07-CV-00855 (JCH), 2008 WL 220750, at *3 (D. Conn. Jan. 25, 2008) (plaintiff alleged insurer "refused to pay other former [employees of the plaintiff's husband's company] who received annuities as a result of the termination [of a] pension plan"); *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 117 (D. Conn. 2014) (plaintiff alleged insurer failed to reimburse three homeowners "experienc[ing] the same damages caused by the same mechanism and involving policy language identical to that in the [plaintiff's] policy").[5] Thus, I find that Murphy Medical has alleged a general business practice.

(iii) <u>Adequacy of Pleadings</u>

Finally, UMR argues that Murphy Medical has not pled its CUIPA claims with sufficient particularity. "While Connecticut courts have required CUTPA claims to be pled with particularity, absent allegations of fraud, this procedural requirement does not apply in federal court." *Malick v. J.P. Morgan Chase Bank, N.A.*, No. 3:13-CV-00669 (VLB), 2015 WL

[5] Most of the case law on "general business practices" under CUIPA involves insureds, who generally cannot allege that they submitted hundreds of claims to the same insurer over multiple years. As such, most insureds *must* identify other victims of misconduct to show that an insurer engaged in conduct with "such frequency as to indicate a general business practice," Conn. Gen. Stat. § 38a-816(6). There does not appear to be any reason to impose the same requirement on a health care provider that presents allegations of similar conduct in hundreds of claims over multiple years. In any event, the similarity of claims made by other alleged victims is only one of multiple factors courts "may" find "relevant" to their general business practice analysis. *Belz*, 46 F. Supp. 3d at 166; *see id.* at 167 (considering the insurer's allegedly similar treatment of three other insureds alongside other factors, including that insurer had an "incentive and mechanism to avoid liability under its current policy language").

5708557, at *8 n.4 (D. Conn. Sept. 29, 2015) (internal citations and quotations omitted). As such, I need only consider whether Murphy Medical has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Murphy Medical alleges that UMR has engaged in unfair settlement practices in violation of Conn. Gen. Stat. §§ 38a-816(6)(D), (F), (H), (L), and (N). ECF No. 63 at 31-32 ¶¶ 158-62. Those provisions bar Murphy Medical from "committing or performing with such frequency as to indicate a general business practice any of the following:"

> (D) refusing to pay claims without conducting a reasonable investigation based upon all available information;
>
> (F) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; . . .
>
> (H) attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; . . .
>
> (L) delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information; [and] . . .
>
> (N) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]

Conn. Gen. Stat. § 38a-816(6).

Murphy Medical has sufficiently alleged that UMR engaged in unfair settlement practices in violation of Subsections (D), (F), and (N). Taken as true, Murphy Medical's allegations establish that UMR requested unnecessary records for hundreds of claims. ECF No. 63 at 14 ¶ 64, 15 ¶¶ 71-72. In some instances, UMR allegedly denied claims without giving Murphy Medical an opportunity to submit the records UMR had requested. *Id.* at 15 ¶ 73. And UMR ultimately denied or paid a fraction of every claim, ECF No. 63-1, giving "incomprehensible"

explanations for its denials, ECF No. 63 at 20 ¶¶ 97-99, 21 ¶ 101. At the motion to dismiss stage, these allegations support an inference that UMR had a general practice of (1) "refusing to pay claims without conducting a reasonable investigation based upon all available information," Conn. Gen. Stat. § 38a-816(6)(D), (2) "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," *id.* § 38a-816(6)(F), and (3) "failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement," *id.* § 38a-816(6)(N).

However, the amended complaint does not adequately allege that UMR engaged in unfair settlement practices under Subsections (H) and (L). Murphy Medical does not make any allegations regarding "written or printed advertising material accompanying or made part of an [insurance] application," *id.* § 38a-816(6)(H). So I cannot infer UMR "attempt[ed] to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application." *Id.* Likewise, Murphy Medical does not allege that UMR ever required the submission of "a formal proof of loss form." *Id.* § 38a-816(L). Thus, the allegations in the amended complaint do not support an inference that UMR "delay[ed] the investigation or payment of claims by requiring [a] … physician … to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms." *Id.* I therefore dismiss the portion of Murphy Medical's CUTPA claim that alleges violations of Subsections (H) and (L).

However, UMR has adequately alleged facts to support its other CUIPA theory: that UMR violated Conn. Gen. Stat § 38a-816(15). Under § 38a-816(15), an insurer engages in an unfair insurance practice when it:

> (A) Fail[s] . . . to pay . . . health claims, including, but not limited to, claims for payment or reimbursement to health care providers, within the time periods set forth in subparagraph (B) of this subdivision, unless the Insurance Commissioner determines that a legitimate dispute exists as to coverage, liability or damages or that the claimant has fraudulently caused or contributed to the loss . . . .
>
> (B) Each insurer . . . shall pay claims not later than:
>
> > (i) For claims filed in paper format, sixty days after receipt by the insurer of the claimant's proof of loss form or the health care provider's request for payment filed in accordance with the insurer's practices or procedures, except that when there is a deficiency in the information needed for processing a claim, as determined in accordance with section 38a-477, the insurer shall (I) send written notice to the claimant or health care provider, as the case may be, of all alleged deficiencies in information needed for processing a claim not later than thirty days after the insurer receives a claim for payment or reimbursement under the contract, and (II) pay claims for payment or reimbursement under the contract not later than thirty days after the insurer receives the information requested; and
> >
> > (ii) For claims filed in electronic format, twenty days after receipt by the insurer of the claimant's proof of loss form or the health care provider's request for payment filed in accordance with the insurer's practices or procedures, except that when there is a deficiency in the information needed for processing a claim, as determined in accordance with section 38a-477, the insurer shall (I) notify the claimant or health care provider, as the case may be, of all alleged deficiencies in information needed for processing a claim not later than ten days after the insurer receives a claim for payment or reimbursement under the contract, and (II) pay claims for payment or reimbursement under the contract not later than ten days after the insurer receives the information requested.

Murphy Medical has sufficiently alleged that UMR failed to pay claims by the statutory deadline. The amended complaint does not address whether Murphy Medical submitted its claims to UMR in paper format or electronically. Even if I assume the claims were submitted on paper, which extends UMR's deadlines, UMR was still required to pay the claims "sixty days after receipt by the insurer of . . . the health care provider's request for payment filed in accordance with the insurer's practices or procedures," unless there is "a deficiency in the information needed for processing a claim." *Id.* If there is a deficiency—which Murphy Medical

claims there was not—UMR has 30 days after the claim was submitted to notify Murphy Medical of "all alleged deficiencies in information needed." *Id.* When it receives the requested information, UMR must pay claims within 30 days. *Id.* Murphy Medical alleges that UMR "sometimes" took "several months" to make a benefits decision after a claim was submitted, ECF No. 63 at 19 ¶ 94; it also alleges that UMR never paid certain claims after receiving records from Murphy Medical, *id.* at 15 ¶ 73. These allegations are sufficient to support an inference that, on at least one occasion, UMR missed the deadlines in § 38a-816(15).

For the reasons explained above, Murphy Medical's CUTPA claim may proceed on the theory that UMR violated CUIPA by violating §§ 38a-816(6)(D), (F), and (N) and by failing to pay claims by the statutory deadline in § 38a-816(15). However, Murphy Medical has not adequately alleged that UMR violated §§ 38a-816(6)(H) and (L), and I dismiss the portion of its CUTPA claim that asserts violations of those provisions.

2. Other CUTPA Theories

In addition to its CUIPA theory, Murphy Medical also alleges that UMR violated CUTPA when it failed to comply with the FFCRA, the CARES Act, and Connecticut's Surprise Billing Law and pressured Murphy Medical to seek reimbursement from patients. UMR argues that these theories are faulty because (1) Murphy Medical's treatment of UMR members was not governed by the Connecticut Surprise Billing Law, (2) Murphy Medical cannot assert CUTPA claims for violations of any insurance statute besides CUIPA, and (3) Murphy Medical has not alleged facts to support its claim that UMR told Murphy Medical to seek reimbursement from patients. I grant in part and deny in part UMR's motion to dismiss these portions of the CUTPA claim.

(i)    Surprise Billing Theory

UMR argues that Murphy Medical's Surprise Billing Law theory fails, because it has not sufficiently alleged that the medical care it provided to UMR's members is governed by the statute. I agree, because Murphy Medical does not adequately allege that it provided "emergency services" to individuals with "emergency medical conditions."

Connecticut's Surprise Billing Law is designed to protect patients from unexpected charges for out-of-network emergency care. Insurers cannot impose a "coinsurance, copayment, deductible or other out-of-pocket expense" for "emergency services rendered to an insured by an out-of-network health care provider" that is greater than the corresponding expense that would be imposed for such services rendered by an in-network provider. Conn. Gen. Stat. § 38a-477aa(b)(2). And it is "an unfair trade practice . . . for any health care provider to request payment from an [insured patient], other than a coinsurance, copayment, deductible or other out-of-pocket expense, for . . . emergency services . . . covered under a health care plan and rendered by an out-of-network health care provider." *Id.* § 20-7f. Instead, a health care provider may "bill the [insurer] directly and the [insurer] shall reimburse such health care provider the greatest of . . . (i) The amount the insured's health care plan would pay for such services if rendered by an in-network health care provider; (ii) the usual, customary and reasonable rate for such services; or (iii) the amount Medicare would reimburse for such services." *Id.* § 38a-477aa(b)(3)(A). The amended complaint alleges that UMR violated this latter provision by failing to reimburse Murphy Medical for COVID-19 testing and related services. ECF No. 63 at 22-23 ¶¶ 106-111, 30 ¶¶ 150-52.

UMR argues that the Surprise Billing Law does not apply, because Murphy Medical has "not alleged sufficient facts establishing that [it] provided 'emergency services' to patients with

'emergency medical conditions.'" ECF No. 76 at 9. The Surprise Billing Law offers the following definitions of those terms:

> 'Emergency medical condition' means a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that a prudent layperson with an average knowledge of health and medicine, acting reasonably, would have believed that the absence of immediate medical attention would result in serious impairment to bodily functions or serious dysfunction of a bodily organ or part, or would place the person's health or, with respect to a pregnant woman, the health of the woman or her unborn child, in serious jeopardy.

Conn. Gen. Stat. §§ 38a-477aa(a)(1) and 38a-591a(14).

> 'Emergency services' means, with respect to an emergency condition, (A) a medical screening examination as required under Section 1867 of the Social Security Act, as amended from time to time, that is within the capability of a hospital emergency department, including ancillary services routinely available to such department to evaluate such condition, and (B) such further medical examinations and treatment required under said Section 1867 to stabilize such individual that are within the capability of the hospital staff and facilities.

*Id.* § 38a-477aa(a)(2).

The amended complaint is short on details about the circumstances of Murphy Medical's patients. It alleges that it tested "patients who have or potentially have exposure to COVID-19" and "patients . . . with symptoms of COVID-19." ECF No. 63 at 6 ¶ 29. It also alleges that Murphy Medical tested for other respiratory viruses because it believed such testing "is vitally important to ensure that patients who present with symptoms . . . receive the most appropriate and effective treatment for a life-threatening condition." *Id.*; *see also id.* at 9 ¶ 42 (alleging that blood testing, which was necessary to "determine the potentially life-threatening damage that the virus was doing or had done to the body's organs and systems," included "checking for certain protein levels, vitamin levels, [and] hormone levels").

While a court in this district has concluded that similar allegations are sufficient at the motion to dismiss stage, *see Murphy Med. Assocs.*, 2023 WL 3434988, at *6, I respectfully

disagree. Allegations that some of Murphy Medical's patients had certain unspecified symptoms of COVID-19 or "exposure" or "potential[]" exposure to COVID-19—without more—do not support an inference that these patients had "acute symptoms of sufficient severity, including severe pain, such that a prudent layperson with an average knowledge of health and medicine, acting reasonably, would have believed that the absence of immediate medical attention would result in serious impairment to bodily functions or serious dysfunction of a bodily organ or part." Conn. Gen. Stat § 38a-591a(14). Nor has Murphy Medical alleged that it provided "emergency services," either in the form of an emergency "medical screening examination," or "further medical examinations and treatment required . . . to stabilize" its patients. *Id.* § 38a-477aa(a)(2). Therefore, the allegations in the amended complaint do not support Murphy Medical's theory that UMR violated Connecticut's Surprise Billing law.

 (ii) *FFCRA and CARES Act Theories*

  UMR next contends that Murphy Medical cannot sustain a CUTPA claim based on the theory that UMR violated the FFCRA and the CARES Act. UMR points to the Connecticut Supreme Court's ruling in *State v. Acordia*, which held that, "[b]ecause CUIPA provides the exclusive and comprehensive source of public policy with respect to general insurance practices, . . . unless an insurance related practice violates CUIPA or, arguably, some other statute regulating a specific type of insurance related conduct, it cannot be found to violate any public policy and, therefore, it cannot be found to violate CUTPA." 310 Conn. 1, 37 (2013).

  As UMR acknowledges, other judges in this district have permitted healthcare providers to maintain CUTPA actions based on violations of "other statute[s] regulating a specific type of insurance related conduct." *See Murphy Med. Assocs.*, 2023 WL 3434988, at *3-4, *7 (holding that plaintiffs could "bring certain . . . CUTPA claims based on alleged violations of statutes

regulating a specific type of insurance related conduct," and denying motion to dismiss CUTPA claim alleging violations of the CARES Act, the FFCRA, and the Connecticut Surprise Billing Law); *NEMS PLLC*, 615 F. Supp. 3d 125 at 138 (reaching the same conclusion, and denying motion to dismiss CUTPA claim under the Connecticut Surprise Billing Law, although Judge Nagala later certified this issue to the Connecticut Supreme Court at the summary judgment stage). Some Connecticut trial courts have also denied motions to strike CUTPA claims based on violations of other insurance statutes. *See Blakeslee Arpaia Chapman, Inc. v. Kiewit Infrastructure Co.*, No. KNL-CV-22-6059097-S, 2023 WL 2662022, at *2 (Conn. Super. Ct., Judicial District of New London, Mar. 24, 2023) (collecting cases). *But see Chicago Title Ins. Co. v. LaPuma*, No. AAN-CV-15-6018031-S, 2016 WL 5339456, at *4-6 (Conn. Super. Ct., Judicial District of Ansonia-Milford, Aug. 23, 2016) (holding that "unfair insurance practices are exclusively defined by CUIPA" and dismissing CUTPA claim for violations of another insurance statute).

Judge Nagala recently certified to the Connecticut Supreme Court the question of whether "a plaintiff [can] successfully maintain an action under CUTPA, for actions that do not violate CUIPA, but purport to violate the Surprise Billing Law, because the Surprise Billing Law regulates a specific type of insurance related conduct, under *State v. Acordia*." *NEMS PLLC v. Harvard Pilgrim Health Care of Connecticut, Inc.*, No. 3:21-CV-01169 (SVN), 2023 WL 4273748, at *9 (D. Conn. June 29, 2023).[6] The Connecticut Supreme Court accepted the certification request, and it held oral argument on February 6, 2024.

Although the issue certified in *NEMS* involves the Surprise Billing Law, and I have dismissed the CUPTA theory asserting a violation of that law, the court's ruling is likely to shed

[6] As noted, Judge Nagala denied a motion to dismiss NEMS' complaint on these grounds, *NEMS PLLC*, 615 F. Supp. 3d 125 at 138, but later certified this question to the Connecticut Supreme Court at the summary judgment stage, along with two other questions.

considerable light on whether *State v. Acordia* bars plaintiffs from asserting CUTPA claims based on violations of other insurance statutes, such as the FFCRA and the CARES Act. Since a ruling from the Connecticut Supreme Court on this issue appears imminent, I see no need to predict what the court will conclude at this stage of the litigation. I therefore reserve judgment on the issue of whether Murphy Medical can maintain a CUTPA action for violations of the FFCRA and the CARES Act. Thus, I deny UMR's motion to dismiss these CUTPA theories without prejudice to UMR's revisiting the legal sufficiency of these theories in a motion for summary judgment, if the Connecticut Supreme Court's ruling in *NEMS* indicates that such theories are not cognizable. If, for any reason, the Connecticut Supreme Court does not answer the certified question, UMR may also renew its arguments in a motion for summary judgment.

(iii)    Remaining CUTPA Theory

The amended complaint also alleges that UMR violated CUTPA by directing Murphy Medical to bill patients for COVID-19 tests, in violation of "multiple federal and Connecticut laws." ECF No. 63 at 33 ¶ 179. The amended complaint does not point to any federal law that UMR allegedly told it to violate. But it does allege that UMR "suggest[ed] that [Murphy Medical] seek payment from the patient" for COVID-19 testing, in violation of Connecticut's Surprise Billing Law. *Id.* at 34 ¶¶ 180-81. As I have explained, the Surprise Billing Law does not govern the type of care that Murphy Medical allegedly provided to patients. Even if it did, the facts alleged in the amended complaint do not support an inference that UMR instructed Murphy Medical to collect payments from patients. The amended complaint states that UMR "issued false Explanations of Benefits (EOBs) to the patients stating that the patient, not UMR, was obligated to pay for these services." *Id.* at 32 ¶ 164. But it includes no allegations regarding any statements UMR made to Murphy Medical about collecting from patients. I therefore grant

UMR's motion to dismiss as to Murphy Medical's theory that UMR violated CUTPA by instructing Murphy Medical to bill patients for COVID-19 tests.

**B. Unjust Enrichment Claim**

Next, UMR moves to dismiss Murphy Medical's unjust enrichment claim. ECF No. 68-1 at 19-20. "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 283 (1994) (internal quotation marks omitted). UMR argues that Murphy Medical's unjust enrichment claim fails at the first step, because UMR did not benefit "from the COVID testing services allegedly provided to plan members." ECF No. 68-1 at 20.

Murphy Medical's complaint includes two claims regarding the benefits UMR allegedly received. First, it alleges that "UMR was able to save time and money because it did not have to administer, process, or pay claims for COVID-19 tests that its members or the members of the plan it administers desperately needed." ECF No. 63 at 35 ¶ 191. Second, it alleges that UMR saved money by "wrongfully denying or fractionally paying the COVID-19 testing costs. *Id.* at 35 ¶ 193. Thus, Murphy Medical's claim is based on the theory, adopted by some courts, that "the insurer's benefit is not the provision of the healthcare services *per se*, but rather the discharge of the obligation the insurer owes to its insured." *Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*, No. 20-CV-09183 (AJN), 2021 WL 4437166, at *12 (S.D.N.Y. Sept. 28, 2021) (internal quotation marks omitted).

The parties have cited—and I have found—no precedent from any Connecticut appellate court addressing whether an insurer benefits from health care services provided to its insureds for

the purposes of an unjust enrichment claim. In this district, another judge has held that "[health care] providers cannot bring unjust enrichment claims against insurance companies based on the services rendered to the insureds." *Murphy Med. Assocs., LLC v. 1199 SEIU Nat'l Benefit Fund*, No. 3:22-CV-00064 (KAD), 2023 WL 2631811, at *6 (D. Conn. Mar. 24, 2023); *Murphy Med. Assocs., LLC v. Yale Univ.*, No. 3:22-CV-00033 (KAD), 2023 WL 2631798, at *8 (D. Conn. Mar. 24, 2023) (reaching the same conclusion); *MC1 Healthcare, Inc. v. United Health Groups, Inc.*, No. 3:17-cv-01909 (KAD), 2019 WL 2015949, at *10-11 (D. Conn. May 7, 2019) (same). The Connecticut Superior Court has reached mixed conclusions on similar unjust enrichment claims brought against automobile insurers by companies that serviced insured cars after an accident. *Compare Grand Prix Motors, Inc. v. Greene*, No. DBD-CV-21-6038357-S, 2021 WL 4287349, at *5 (Conn. Super. Ct., Judicial District of Danbury, Sept. 1, 2021) (dismissing towing company's unjust enrichment claim against insurer, and observing that "it is unclear how the [insurer] directly benefited from the plaintiff's [towing the insured car after an accident], because the plaintiff did not provide any services directly to the [insurer]") *with Muoio v. Gabby's Auto, LLC*, No. AAN-CV-09-5010110-S, 2015 WL 670889, at *6 (Conn. Super. Ct., Judicial District of Ansonia-Milford, Jan. 28, 2015) (denying motion to strike unjust enrichment claim against insurer where auto repair firm repaired insured car after accident, and holding that insurer "received a benefit by having a financial obligation it owed under its insurance contract fully satisfied without it incurring any cost or expense for this satisfaction").

I find that Murphy Medical has not adequately alleged that UMR benefitted from the provision of health care to its insureds. As other courts in this circuit have reasoned, "[i]t is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurance company

gets is a ripened obligation to pay money to the insured — which hardly can be called a benefit." *Murphy Medic. Assocs.*, 2023 WL 2631811 at *6 (quoting *Travelers Indem. Co. of Connecticut v. Losco Group, Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001)). Courts in other jurisdictions have often, although not universally, reached the same conclusion.[7] I therefore grant UMR's motion to dismiss as to Murphy Medical's unjust enrichment claim.

**C. Breach of Contract Claim**

In addition to Murphy Medical's unjust enrichment claim, the amended complaint alleges that an "implied contract was created between [Murphy Medical] and UMR." ECF No. 63 at 28 ¶ 131. UMR points out that the amended complaint is unclear as to whether Murphy Medical is raising an implied-in-fact contract claim, or an implied-in-law contract claim (i.e., an unjust enrichment claim, *see Vertex, Inc. v. Waterbury*, 278 Conn. 557, 574 (2006)). ECF No. 68-1 at

[7] *See, e.g.*, *MC1 Healthcare, Inc.* 2019 WL 2015949, at *10-11 (collecting cases); *Hudson Neurosurgery, PLLC v. UMR, Inc.*, No. 20-CV-09642 (KMK), 2023 WL 6311218, at *7 (S.D.N.Y. Sept. 28, 2023) (dismissing unjust enrichment claim brought against UMR based on theory that UMR, as an administrator of health plans, "may later get a cut of the Benefit Plan's own financial relief"); *Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Ins. Co.*, No. 23-CV-08521 (JSR), 2023 WL 8534865, at *6 (S.D.N.Y. Dec. 11, 2023) (dismissing unjust enrichment claim and finding insurer did not benefit from health care services provided to insured); *Piney Woods ER III, LLC v. Blue Cross & Blue Shield of Texas*, No. 5:20-CV-00041, 2020 WL 13042507, at *7 (E.D. Tex. Oct. 2, 2020) (same under Texas law); *BCBSM, Inc. v. GS Labs*, LLC, No. 22-CV-00513, 2023 WL 2044329, at *7 (D. Minn. Jan. 30, 2023) (same under Minnesota law). *But see Epic Reference Labs v. Cigna*, No. 3:19-CV-01326 (SRU), 2021 WL 4502836, at *18 (D. Conn. Sept. 30, 2021) (denying motion to dismiss quantum meruit claim under Florida law because "[t]here is a 'clear split of authority' in Florida courts regarding whether an insurer benefits when a provider serves its subscribers . . . . Given the unsettled nature of Florida law, I am inclined to let this claim survive at this early stage of litigation" (citations omitted)); *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240 n.26 (3d Cir. 2020) (noting that "district judges in New Jersey have disagreed over whether a healthcare provider's provision of services to an insured may ever constitute a 'benefit' to an insurer for purposes of an unjust enrichment claim"); *32nd St. Surgery Ctr., LLC v. Right Choice Managed Care*, No. 12-CV-05134, 2013 WL 12202938, at *7 (W.D. Mo. July 24, 2013) (denying motion to dismiss healthcare provider's unjust enrichment claims against Managed Care Organization, and finding that MCO benefitted when its members received care for which it did not pay "usual and customary rate"); *HCA Health Servs. of Virginia, Inc. v. CoreSource, Inc.*, No. 3:19-CV-00406, 2020 WL 4036197, at *6 (E.D. Va. July 17, 2020) (same for hospital's unjust enrichment claim against life insurance company). Courts are more likely to find an insurer benefits from the provision of health care services if the insurer is a "Managed Care Organization," and is therefore "actually responsible for providing healthcare services to members, either directly or through a network of contracted providers*." See Air Evac EMS Inc. v. USAble Mut. Ins. Co.*, No. 4:16-CV-00266, 2018 WL 2422314, at *10 (E.D. Ark. May 29, 2018), *aff'd*, 931 F.3d 647 (8th Cir. 2019) (compiling cases); Restatement (Third) of Restitution and Unjust Enrichment § 22(2)(b) ("A person who performs another's duty … to furnish necessaries to a third person, to avoid imminent harm to the interests of the third person" is entitled to restitution); *id.* illus. 10 (providing as an example a situation where a situation where a hospital "provides emergency services to patients enrolled with a Managed Care Organization").

12-14. UMR argues that either claim should be dismissed. *Id.* In its response to the motion to dismiss, Murphy Medical notes that "claims for unjust enrichment and implied in law contracts have the same elements," ECF No. 73 at 18 n.7, but does not otherwise address UMR's argument that any implied-in-fact contract claim should be dismissed. Since Murphy Medical appears to concede that its implied contract claim is an implied-in-law contract claim, I dismiss that claim as duplicative of its unjust enrichment claim. To the extent the amended complaint raises a separate implied-in-fact contract claim, I find that any such claim has been abandoned. *See Thurmand v. Univ. of Connecticut*, No. 3:18-CV-01140 (JCH), 2019 WL 369279, at *3 (D. Conn. Jan. 30, 2019) ("Courts in this Circuit have presumed that plaintiffs have abandoned their claims when they do not oppose a motion to dismiss them."); *Naughton v. Gutcheon*, No. 3:21-CV-00402 (KAD), 2022 WL 3646177, at *10 (D. Conn. Aug. 24, 2022) ("Plaintiff did not address [arguments that substantive due process and retaliation claims should be dismissed] in her opposition to Defendants' motions to dismiss and, therefore, has abandoned [those] claims.").

## V.     CONCLUSION

For the reasons stated above, I GRANT in part and DENY in part UMR's motion to dismiss. I grant UMR's motion to dismiss as to (1) the CUTPA theory based on UMR's alleged violations of Conn. Gen. Stat. §§ 38a-816(6)(H) and (L), (2) the CUTPA theory based on UMR's alleged violations of Connecticut's Surprise Billing Law, (3) the CUTPA theory based on UMR allegedly pressuring Murphy Medical to violate state or federal law, (4) the unjust enrichment claim, and (5) the breach of contract claim. I deny without prejudice UMR's motion to dismiss Murphy Medical's CUTPA claims related to alleged violations of the FFCRA and the CARES Act. If the Connecticut Supreme Court's ruling in *NEMS, PLLC v. Harvard Pilgrim Healthcare*

*of Connecticut, Inc.* (SC 20914) indicates that such CUTPA claims are not cognizable, or if the Connecticut Supreme Court declines to answer the third certified question in that case, UMR may renew its argument in a motion for summary judgment. I deny with prejudice UMR's motion to dismiss as to all other claims.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
March 12, 2024